Case 1:12-cv-00098-WFK-LB Document 51-13 Filed 06/19/16 Page 1 of 116 PageID #: 546

1                                                                    1

2    UNITED STATES DISTRICT COURT

3    EASTERN DISTRICT OF NEW YORK
     -------------------------------------------X
4
     NICOLE PHILLIPS, Individually and on
5    behalf of BP and SP, minors;
     FABIAN MENDOZA-VACA, Individually and on
6    behalf of MM and VM, minors; DINA CHECK,
     Individually and on behalf of MC, a minor;
7
                         Plaintiff,
8
         -against-            12-cv-98 (WFK)(LB)
9
     CITY OF NEW YORK; ERIC T. SCHNEIDERMAN,
10   in his Official Capacity as Attorney General,
     State of New York; NIRAV R. SHAH, in his
11   Official Capacity as Commission, New York
     State Department of Health;
12
                         Defendants.
13   -------------------------------------------X

14                       100 Church Street
                         New York, New York 10007
15
                         May 14th, 2014
16                       10:31 a.m.

17

18         DEPOSITION of JULIA SYKES, a Non-party

19   witness herein, taken by the Plaintiff,

20   pursuant to Article 31 of the Civil Practice

21   Law & Rules of Testimony, and Notice, held at

22   the above-mentioned time and place, before

23   JENNIFER CASSELLA, a Notary Public of the

24   State of New York.

25

1                                                                    2

2

3    A P P E A R A N C E S

4

5        PATRICIA FINN ATTORNEY, P.C.
             Attorneys for Plaintiff
6            450 Piermont Avenue
             Piermont, New York 10968
7        BY: PATRICIA FINN, ESQ.
         LOUIS LEUTHAN, ESQ.
8

9        CORPORATION COUNSEL OF THE CITY OF NEW
         YORK
10           Attorneys for Defendant, City of
         New York
11       100 Church Street
         New York, New York 10007
12       BY: ZACHARY W. CARTER, ESQ.

13

14       HON. ERIC T. SCHNEIDERMAN
             Attorney General of the State of
             New York
15           Attorneys for New York State
             Defendants
16           120 Broadway
             New York, New York 10271
17       BY: TODD SPIEGELMAN, ESQ.

18

19       NYC DEPARTMENT OF HEALTH & MENTAL
         HYGIENE
             Attorneys for Defendant
20           413 East 120th Street, 2nd Floor
             New York, New York, 10035
21       BY: JORGE MARTINEZ, ESQ.

22

23

24

25

♀

1                                              3

2    S T I P U L A T I O N S

3        IT IS HEREBY STIPULATED AND AGREED, by and

4    between the attorneys for the respective

5    parties hereto, that:

6        All rights provided by the C.P.L.R., and

7    Part 221 of the Uniform Rules for the Conduct

Case 1:12-cv-00984-WFK-CLP Document 51-1 Filed 06/19/16 Page 3 of 116 PageID #: 548

8    of Depositions, including the right to object

9    to any question, except as to form, or such

10    other irregularity that would be waived if

11    not interposed, or to move to strike any

12    testimony at this examination is reserved.

13    The failure to object to any question, or

14    to move to strike any testimony at this

15    examination, except as to form or other

16    irregularity shall not be a bar or waiver to

17    make such motion at, and is reserved to, the

18    time of trial of this action.

19    An attorney shall not interrupt the

20    deposition for the purpose of communicating

21    with the deponent unless all parties consent

22    or the communication shall be stated clearly

23    for the record.

24    This deposition shall be sworn to by the

25    witness being examined before a Notary Public

1                                    4

2    other than the Notary Public before whom this

3    examination was begun, but the failure to do

4    so or to return the original of this

5    deposition to counsel shall not be deemed a

6    waiver of the rights provided by Rule 3116 of

7    the C.P.L.R. and shall be controlled thereby.

8    The filing of the original of this

9    deposition is waived.

10    IT IS FURTHER STIPULATED, that a copy of

11    this examination shall be furnished to the

SYKES DEPO

12    attorney for the witness being examined

13    without charge.

14

15

16

17

18

19

20

21

22

23

24

25

♀

1                    JULIA SYKES                5

2     J-U-L-I-A  S-Y-K-E-S, after having first been

3     duly sworn by a Notary Public of the State of

4     New York, was examined and testified as

5     follows:

6     EXAMINATION

7     BY MS. FINN:

8          Q.   State your name for the record,

9     please.

10         A.   Julia Sykes.

11         Q.   State your address for the record,

12    please.

13         A.   28-11 Queens Plaza North, Room 402,

14    Long Island City 11101.

15         Q.   Good afternoon -- Good morning, Ms.

16    Sykes.

Case 1:12-cv-00984-WEK6L-BO Document 51-41 03/Z/FH/20 D6/19 10468 Page 5 of 161 PageID #: 550

17     A.  Good morning.

18     Q.  My name is Patricia Finn.  I am the

19  attorney for the plaintiffs in this matter.

20  I'm going to ask you a series of questions.

21  If you don't understand any questions that I

22  ask or you're confusing -- or I'm confusing

23  to you, you can simply ask me to restate the

24  question.  If your attorney interjects or

25  instructs you not to answer, you should then

1              JULIA SYKES        6

2  wait before we continue.  All right?

3     A.  Yes.

4     Q.  Can you state your name and your

5  title with the City of New York?

6     A.  My name is Julia Sykes.  I am the

7  health service coordinator for the Department

8  of Education.

9     Q.  Where is your office located?

10     A.  Office of School Health at 28-11

11  Queens Plaza North, Room 402, Long Island

12  City.

13     Q.  Who is your direct supervisor?

14     A.  Ava Mopper (phonetic).

15     Q.  Ava Mopper?

16     A.  Yes, ma'am.

17     Q.  Can you tell me how long you've

18  been working with the City of New York?

19     A.  I've been with the City of New York

20  going on 35 years as of December 1st this

21    year.

22        Q.    How long have you been the health

23    liaison coordinator?

24        A.    For the last 20 years.

25        Q.    Has your job as the health liaison

1                        JULIA SYKES                7

2    -- is that --

3                        MR. CARTER: It's health

4                services coordinator.

5        A.    Health services coordinator, yes.

6        Q.    Has that always involved the review

7    of vaccine exemptions?

8        A.    That's just part of my job.

9        Q.    Can you tell me a little bit about

10    the other parts of your job?

11        A.    I do -- I conduct vision screening

12    trainings for school staff. I also do

13    workshops in the areas of immunization, at

14    one time for TB, any health issues I do staff

15    development for them.

16        Q.    Do you have a medical background?

17        A.    No.

18        Q.    Can you tell me about your

19    education and any undergraduate or graduate

20    studies?

21        A.    I have a bachelors degree in

22    psychology.

23        Q.    Where did you get that?

24        A.    College of New Rochelle.

25        Q.    The screening and the training that

SYKES DEPO

| 1 | | JULIA SYKES | 8 |

2     you provide, you mentioned that sometimes

3     that involves vaccines?

4         A.   No, no, no, not vaccines.  It's

5     vision -- vision screening for the eyes.  I

6     do training for the schools.

7         Q.   Do you do eye testing; what do you

8     do?

9         A.   I did at one time.  When I first

10    started with the Department of Education, I

11    was part of the vision screening team that

12    went out to the schools to do vision

13    screenings.

14        Q.   On the children?

15        A.   Yes.

16        Q.   I didn't know if it was the staff.

17        A.   No, not staff.

18        Q.   And do you use those cards with the

19    letters?

20        A.   The snellen and eye charts, yes.

21        Q.   What's it called?

22        A.   It's the snellen and eye charts.

23               MR. CARTER: Julia, could I

24               just ask, make sure you let her

25               finish the questions so the court

| 1 | | JULIA SYKES | 9 |

2               reporter can take it down so you

SYKES DEPO

 3      don't overlap. Otherwise, we're
 4      going to drive the court reporter
 5      crazy.
 6              MS. FINN: I talk really slow
 7      too, sorry.
 8      Q.    How long did you do the eye chart
 9  examination during your 35 years with the
10  city?
11      A.    What do you mean how long?
12      Q.    How long were you involved in that
13  type of training with the eye charts?
14      A.    Well, my training is ongoing, I do
15  ongoing for the school staff.
16      Q.    Regarding your screening and
17  training for the school staff, have you done
18  any training for the school staff involving
19  vaccinations or vaccination exemptions?
20      A.    Not vaccinations, but I do training
21  for -- to let them know what the requirements
22  -- the State and the Chancellor Regulations
23  requirement is for immunizations.
24      Q.    And what are those requirements?
25      A.    Well, there's a full set of


 1              JULIA SYKES              10
 2  requirements for -- depending on what grade
 3  the student is in.  Do you want me to give
 4  you a break down of the different vaccines
 5  that are required?
 6      Q.    Sure.
 7      A.    For Pre-K and K, there's

Page 8

Case 1:12-cv-00984VEKCLBoDonumteit2-413/Zfile0D6/19/1468Pag9e9ofd1161PageID #: 554

SYKES DEPO

8    Diphtheria, Polio, MMR, which is Measle,

9    Mumps and Rubella, Varicella, Hepatitis B.

10    For Pre-K is the Hib vaccine and the PCV

11    vaccine. Kindergarten has -- they're not

12    required to have Hib or the PCV, and for

13    grades one through twelve, they're required

14    to have not only those vaccines, but they're

15    required to have -- grade six through grade

16    twelve, they're required to have the TDAP

17    booster vaccine.

18        Q.   Where are these vaccine

19    requirements you just referred to; where are

20    they located, in the Chancellor's rules?

21        A.   They're in Chancellor's Regulations

22    as well as the State Education Law section

23    2164.

24        Q.   Have you received any legal

25    training regarding the vaccination

1               JULIA SYKES       11

2    requirements and the Chancellor's regs, or

3    the State Education Law 2164?

4        A.   I never received legal training.

5        Q.   The last time that you did a

6    training for school staff involving

7    vaccination requirements for the children,

8    where did you do that?

9        A.   The last one I did was for District

10    75. It was held at P.S. 35.

11        Q.   When did you do that?

SYKES DEPO

12    A.   May 5th, I would say.  I think it

13  was the fifth.

14    Q.  And approximately how many of these

15  types of screenings do you -- I'm sorry,

16  trainings do you do a year?

17    A.   I conduct trainings on an as-needed

18  basis as I'm asked.  So it could be roughly

19  -- I may do an audience of maybe ten a year.

20    Q.  How many schools under your

21  supervision in the --

22    A.   I don't have any schools under my

23  supervision.  I do the whole city.  If the

24  CFN wants to set up a staff development for

25  their schools, a part of the agenda may be on

♀

1            JULIA SYKES       12

2  immunization requirements.

3    Q.  How many schools are in the City of

4  New York?

5    A.   It's over like 1100, 1200 schools.

6    Q.  Twelve hundred?

7    A.   Don't quote me on that. I'm not

8  quite sure the number.

9    Q.  So you think it's about 1200?

10    A.   Right, maybe more.

11    Q.  Is it more than 2,000?

12    A.  No.

13    Q.  And you do about ten training

14  sessions a year?

15    A.   It could be less, it could be more.

16    Q.  But it's approximately ten?

Case 1:12-cv-00984-KBL-BO Document 51-13/27 Filed 06/19/06 Page 11 of 116 PageID #: 556

17      A.   Yes.

18      Q.   Sometimes you're invited to the

19  schools. Is that what you said?

20      A.   No, no, no. I don't go to the

21  schools.  They have one central location that

22  they bring the school staff to, like

23  secretaries or school aides or teachers to

24  come to one central location for the

25  training, for their staff development.


1                  JULIA SYKES              13

2       Q.   Where is the central location?

3       A.   It's wherever they pick.  It could

4  be anywhere.

5       Q.   It's not at your office?

6       A.   No.

7       Q.   So you would go out to a central

8  location?

9       A.   I would go out to do it, yes.

10      Q.   With regard to the May 5th District

11  75 training, were you invited to do that?

12      A.   Yes.  Actually, it wasn't May 5th,

13  it was May 7th.  I'm sorry. It was a

14  Wednesday.

15      Q.   Do you know who asked you to do

16  this?

17      A.   The coordinator for District 75.

18      Q.   Where is that located?

19      A.   At 400 1st Avenue.

20      Q.   In Manhattan?

SYKES DEPO

21    A.    Yes.

22    Q.    Did the coordinator tell you why

23  they wanted your assistance and training?

24    A.    Well, it wasn't a training.  It was

25  more of an awareness session.  They had


1                    JULIA SYKES              14

2  different keynote speakers at this session

3  and one part of it was immunization

4  requirements, health concerns.

5    Q.    How many people attended this?

6    A.    I think it was roughly 60 people.

7    Q.    What were the topics discussed at

8  the District 75 training?

9    A.    Excuse me?

10    Q.    I'm sorry.  What were the topics

11  discussed, the other topics besides yours on

12  health?

13    A.    Transportation, and I don't really

14  know because I didn't stay for the whole

15  training.  So I just did my piece and I know

16  there was -- as I was leaving, the speaker

17  came out was on transportation.

18    Q.    How long did the training session

19  for District 75 last, if you know?

20    A.    It was all day.

21    Q.    It was all day. How long was your

22  training portion?

23    A.    It was 45 minutes.

24    Q.    Do you remember what time you

25  spoke?

Case 1:12-cv-00984-VEK-Boo Document 51-4 03/27/2006/19/2068 Page 13 of 116 PageID #: 558

♀

```
 1                    JULIA SYKES              15
 2         A.   9:30.
 3         Q.   Were you one of the first speakers?
 4         A.   Yes, I was.
 5         Q.   Were you the first?
 6         A.   Yes, I was.
 7         Q.   Do you have an agenda?
 8         A.   Do I have an agenda?
 9         Q.   Yes, for the --
10         A.   No.
11         Q.   Was there an agenda that you know
12    of?
13         A.   Yes, there was.
14               MS. FINN: Can I get that
15              agenda?
16               MR. CARTER: If I can find
17              it, yeah, sure.  I just ask if you
18              could send me a letter afterwards
19              of everything you want. I'll make
20              notes as we go, but I don't think
21              that's a problem.
22         Q.   So on or about May 7th at 9:30 a.m.
23    you were asked to give an awareness
24    discussion at District -- for District 75 and
25    you spoke about immunizations?
```

♀

```
 1                    JULIA SYKES              16
 2         A.   Correct.
```

SYKES DEPO

3     Q.   Can you tell me what you talked

4   about during that training?

5     A.   I spoke about -- I went over the

6   required vaccines, as well as the new

7   requirements for the next school year.  I

8   made them aware that although Varicella is a

9   recommendation for this school year, next

10   year it will be a requirement for the student

11   to have two Varicella's instead of one, but

12   it's going to start at grades K and six and

13   then it will filter down -- no, I'm sorry,

14   grade K and five, and then each year they're

15   going to add on a grade until we catch up

16   with all the grades.  I also spoke about

17   Polio. It will be, although now it's not --

18   we do not accept a serology for the Polio

19   vaccine but there's something, and it's not

20   finalized yet, that we will be able to accept

21   serology for the Polio vaccines.

22     Q.   Is that new?

23     A.   That's very new.

24     Q.   When was that added?

25     A.   It's not added yet, but it will be

1              JULIA SYKES       17

2   for this school year. They did not finalize

3   it yet.

4     Q.   Who's they?

5     A.   It's the Department of Health.

6     Q.   Do you know who in the Department

7   of Health is --

Case 1:12-cv-00984-EKEB Document 51-41 3/27/20 06/19/2018 Page 15 of 116 PageID #: 560

8      A.   Well, they're having different
9   meetings with the State and the Department of
10  Health.   Actually, we have a meeting tomorrow
11  about this, how we're going to implement
12  this.
13     Q.   Who's going to attend that meeting
14  tomorrow?
15     A.   Department of Health and the
16  Department of Education.
17     Q.   Do you know the names of the people
18  that are attending from the Department of
19  Health and the Department of Education?
20     A.   Dr. Plaque (phonetic), Dr. Zucker
21  (phonetic), the IT people from the Department
22  of Education, I don't know all of their
23  names.
24     Q.   IT?
25     A.   IT, the ones that deal with the

1                    JULIA SYKES              18
2   computer, and myself and people on the staff
3   from the city registry -- immunization
4   registry will be attending the meeting as
5   well.
6      Q.   Tell me, what is the immunization
7   registry?
8      A.   The immunization registry is a
9   computer system that doctors, when they give
10  a vaccination, they have to report it through
11  the immunization registry that they gave the

SYKES DEPO

12    vaccine and you know, the date that they gave

13    the vaccine.

14         Q.   Who manages the --

15         A.   The Department of Health.

16         Q.   Is that --

17         A.   Bureau of Immunization.

18         Q.   Department of Health Bureau of

19    Immunization. The immunization registry, is

20    that a volunteer effort or is that required

21    by law that a doctor report the vaccines

22    given to children?

23         A.   Well, you would have to ask them if

24    it's required by law.

25         Q.   Okay.  How do you -- tell me what

1                    JULIA SYKES            19

2    you know about the immunization registry.

3         A.   Well, I just -- you know, as I just

4    said that the doctors are reporting whenever

5    they give vaccines to a student through the

6    registry, and most vaccination records are

7    kept there if the immunization is done here

8    in New York City.

9         Q.   Is the registry only for New York

10   City or is it a state registry?

11        A.   It's my understanding it's a city

12   registry.

13        Q.   Is there any penalty for a doctor

14   not to report into the registry?

15        A.   I have no -- I cannot answer that

16   question.  I don't know.

                    Page 16

SYKES DEPO

| | | |
|---|---|---|
| 17 | Q. | Is this registry electronic; do you |
| 18 | go on the internet and -- | |
| 19 | A. | It's electronic, yes. |
| 20 | Q. | Do you have a website address for |
| 21 | this registry? | |
| 22 | A. | You have to have access to that, |
| 23 | anyone can't just go into it. | |
| 24 | Q. | Are there any guidelines for |
| 25 | practicing doctors in New York City -- | |

|  |  |  |
|---|---|---|
| 1 | JULIA SYKES | 20 |
| 2 | A. | Yeah, they have guidelines. |
| 3 | MR. CARTER: You got to let | |
| 4 | her finish. You're overlapping and | |
| 5 | she's not going to get it down. I'm | |
| 6 | sorry. | |
| 7 | THE WITNESS: I'm sorry. | |
| 8 | Q. | My question was: Are there any |
| 9 | guidelines or procedures for New York City | |
| 10 | doctors to comply or utilize this | |
| 11 | immunization registry? | |
| 12 | A. | You would have to get that |
| 13 | information from Bureau of Immunization.  I | |
| 14 | do not know. | |
| 15 | Q. | Do you know who at Bureau of |
| 16 | Immunization -- | |
| 17 | A. | You could speak to Dr. Jane Zucker. |
| 18 | Q. | Have you yourself used the |
| 19 | registry? | |
| 20 | A. | Yes. |

Page 17

SYKES DEPO

21    Q.   What do you -- how do you use the

22    registry?

23    A.   I go in and plug in the students

24    name and date of birth and see if there's any

25    immunizations on file in the registry.


1                    JULIA SYKES              21

2    Q.   And then what do you do with that

3    information?

4    A.   What do I do with the information?

5    Q.   Why do you -- I'm sorry --

6    A.   Why do I go into it?

7    Q.   Thank you.  Why do you go into it?

8    A.   Because there's times when there

9    may be some vaccinations that are missing and

10   the registry may have that information.  So

11   we go in, and the schools are able to go in

12   as well and pull documentation from the

13   registry because parents may say that they

14   may have lost their information, and so

15   they're able to go in and get it.

16   Q.   How accurate is the registry data

17   in your experience?

18   A.   Anything that has to do with the

19   registry, you have to ask the Bureau of

20   Immunization.

21   Q.   Well, you just told me that you go

22   to draw information about students to compare

23   with their records, and my question is not to

24   your Dr. Zucker, it's to you.  How accurate

25   is that information?

Page 18

Case 1:12-cv-00984-WEK-BOB Document 51-41-03/27/20 06/19/14 68 Page 19 of 116 PageID #: 564

1               JULIA SYKES              22

2          A.    I assume that the information is

3     very accurate.

4          Q.    Based on your experience, how

5     accurate is that information you draw down

6     from the registry, if you know?

7          A.    I don't know.  I don't question it,

8     the dates that are on there, because I assume

9     that they come from the doctors.

10         Q.    Do you ever find information on

11    this registry that is incorrect?

12         A.    I have.

13         Q.    What have you done in those

14    circumstances?

15         A.    I've contacted the Bureau of

16    Immunization about it.

17         Q.    What do you tell them?

18         A.    It's depending on what the issue

19    was and it hasn't been in awhile, so I really

20    can't say what problems I found.

21         Q.    Well, let's talk about the last

22    time that you had a problem.  You said its

23    been awhile go, but the last time you had a

24    problem with the information in the

25    immunization record -- registry, you said you

1               JULIA SYKES              23

2     reported it to the Board of Immunization?

Case 1:12-cv-00984-WEK6L-BoD Document 51-41 03/27/2006 06/19/2006 68 Page 20 of 116 PageID #: 565

SYKES DEPO

3        A.    Bureau of Immunization.

4        Q.    I'm sorry, Bureau of Immunization.

5    Would that be Dr. Zucker again?

6        A.    I report it to that office, not

7    directly to her, but to her office.

8        Q.    What did you report to them during

9    this last instance?

10       A.    I can't remember now.  I'm not

11   sure, but I know there was one case where the

12   date was not -- was off as far as it was

13   given too soon between the vaccines and when

14   -- once it was plugged into our ATS system,

15   it gave us a date error.

16       Q.    Did you say ATS system?

17       A.    Yes, automate the system --

18   Automate the Schools, that's what it stands

19   for.

20       Q.    So let me just understand this.

21   You have an immunization registry --

22       A.    Uh-huh.

23       Q.    -- and then you have an Automate

24   the School system?

25       A.    Yes.



1                  JULIA SYKES                24

2        Q.    Are they different?

3        A.    It's our computerized system.  Yes,

4    they are.

5        Q.    Do they both track vaccine records?

6        A.    Well, the information that's in ATS

7    is information that's given from the parent

Case 1:12-cv-00984-WEK-L Bo Document 52-41 08/27/20 06/19/18 68 Page 242 of 116 PageID #: 566

8    to the school.

9          Q.    You said that it had been awhile

10   since you had come across a problem with the

11   immunization registry, that it was awhile

12   back and involved the date being off.

13         A.    Right.

14         Q.    Can you tell me how long ago that

15   was?

16         A.    It was last school year.

17         Q.    How many kids in the City of New

18   York are attending these approximate 1200

19   schools?

20         A.    Excuse me?

21         Q.    How many children go to school in

22   New York City; do you know?

23         A.    I have no idea.  I do not have that

24   number.

25         Q.    But there's approximately 1200

1                    JULIA SYKES              25

2    schools, approximately?

3          A.    Okay.

4          Q.    That is what you said though,

5    right?

6          A.    Yeah.

7          Q.    What's the average number of

8    children in a typical school?

9          A.    It depends on the size of the

10   school.  It could be from 500 to -- depends

11   if it's a high school, there could be 2,000

Page 21

Case 1:12-cv-00984-WEK-BO Document 51-1 CB-2 Filed 06/19/04 68 Page 22 of 161 PageID #: 567

SYKES DEPO

12    kids in there.

13         Q.   Okay.  Are you responsible for all

14    their immunization requirements for all these

15    children?

16         A.   The principal is responsible for

17    the immunization requirements.  However, if a

18    school runs into a problem, they will contact

19    my office and we will try to assist them.

20         Q.   How many problems do you encounter

21    a year that you provide assistance to school

22    officials?

23         A.   Every day.

24         Q.   Every day?

25         A.   There's different issues.


1                    JULIA SYKES              26

2         Q.   Let's say with vaccines only.

3         A.   Oh, I never counted it.  It's an

4    ongoing process.  Every day there's something

5    that comes up and it deals with immunization

6    or other problems.

7         Q.   What are some of the issues with

8    immunizations that may be brought to your

9    attention as a potential problem?

10         A.   Such as like with the first MMR,

11    that vaccine may have been given before the

12    first birthday.  We give them a four-day

13    grace period before the first birthday for

14    the vaccine to be acceptable.

15         Q.   I'm sorry, four days?

16         A.   Four-day grace period.  Before it

Case 1:12-cv-00984-WEK-BO Document 51-41 03/27/20 06/19/06 8 Page 232 6 of 116 PageID #: 568

17    used to be 365 days, now it's 361 days the

18    student can have that first MMR vaccine.

19    Sometimes the vaccine is given at nine

20    months, so the schools will call and say, you

21    know, this kid has MMR, but I don't

22    understand why the computer is saying the

23    child is excludable.  So then I would go in

24    and look at it and then I will let them know

25    that it was given too soon.


 1                    JULIA SYKES              27

 2         Q.   When the computer says a child is

 3    excludable, are you taking about the ATS

 4    system?

 5         A.   Yes.

 6         Q.   And that is available to you and to

 7    the school officials?

 8         A.   Yes.

 9         Q.   The ATS?

10         A.   They are the ones that keep it

11    updated.

12         Q.   So the ATS gets parent information?

13         A.   Yes.

14         Q.   And then the ATS is capable based

15    on that parent information of identifying

16    which children are excludable?

17         A.   Yes, there's rules in there.

18         Q.   Is that done electronically?

19         A.   What's done electronically, the

20    rules?

SYKES DEPO

21       Q.   Is there an algorithm that the

22   parent puts in the information into --

23       A.   No, the parent doesn't put anything

24   in.

25       Q.   Well, the parent provides the


1                    JULIA SYKES              28

2   information --

3       A.   To the secretary of the school.

4       Q.   And then the secretary is

5   responsibly for entering it into the ATS?

6       A.   Yes.

7       Q.   Then the ATS may kickback some

8   report that that individual child is

9   excludable?

10       A.   Yes.

11       Q.   Then that is brought to your

12   attention as a potential problem?

13       A.   No, all those are not brought to my

14   attention, no.

15       Q.   The non-resolved ones?

16       A.   Just the one's that are

17   non-resolved, yes.

18       Q.   So let's say you get a non-resolved

19   problem with the child identified as

20   excludable.  It comes to you and you compare

21   that information with the immunization

22   registry?

23       A.   What I would do is I would look and

24   see if that date is accurate, yes.  I would

25   go into the CIR to see which date do they

SYKES DEPO

| | JULIA SYKES | 29 |
|---|---|---|
| 1 | | |

1      have in there. Maybe whoever put in the

2      information, they may have recorded it

3      incorrectly, so I go in the CIR to see if the

4      date is correct.

5      Q.   So the CIR is the doctor

6      information that New York City doctors are --

7      we don't know if it's volunteer, right, or

8      are they required to report vaccines?

9      A.   I know that the Department of

10     Health clinics are required to put it in

11     there.  As far as every doctor in New York

12     City, I cannot say that.  Private doctors may

13     not be required to put them in there, but if

14     they go to the Department of Health free

15     clinics, yes they do put it in there.

16     Q.   In your experience, how accurate

17     has that CIR, which would be the computer

18     immunization registry -- how accurate has

19     that been?

20     A.   Well, based on what like?

21     Q.   Your day-to-day use of the CIR.

22     How accurate is the information?

23     A.   I've never found -- well, I can

24     never say never, but I haven't found too many

JULIA SYKES                    30

problems with it except for there was one or

SYKES DEPO

3  two cases where a date may have been off, but

4  they have a footnote at the bottom because my

5  understanding is that CIR accepts all

6  vaccines from doctors, whether they are

7  invalid or not.  But they do put a footnote

8  on their screen to say that they're, you

9  know, this vaccine was given too soon.

10      Q.   So other than minor issues with

11  dates, you have not experienced too many

12  problems --

13      A.   No.

14      Q.   -- with CIR?

15      A.   No.

16      Q.   But you're not -- but the only

17  information required to be reported into this

18  CIR is from Department of Health clinics,

19  right, that's what you said?

20      A.   Department of Health clinics --

21  Department of Health free clinics are

22  required to input this information in the

23  CIR.

24      Q.   But you don't know it --

25      A.   However, private doctors, I don't


1               JULIA SYKES          31

2  know if they're required to do that or even

3  if they're set up to even submit that

4  information into CIR.

5      Q.   So, when you were giving the

6  District 75 awareness training on May 7th --

7      A.   Yes.

Page 26

SYKES DEPO

8     Q.    -- you indicated that you were

9    talking about the Polio serology, a proposal

10   that it was going to be accepted.  Can you

11   tell me a little bit about that and that

12   process involved there?

13        A.    Well, to me that's not clear yet.

14   I'm not really clear on the process of it,

15   but right now we only accept serology for

16   Measle, Mumps, Rubella, Hepatitis B and

17   Varicella.  It was not acceptable for Polio.

18        Q.    Do you know why it was not

19   accepted?  Did any doctor, Dr. Zucker or

20   anyone tell you why?

21        A.    No, I was always just told it was

22   not acceptable for those vaccines. I don't

23   know the reason behind it, no.

24        Q.    When you say serology, you mean

25   titers, right?

♀

1                    JULIA SYKES                32

2         A.    Blood tests, yes.

3         Q.    So a parent in New York City that

4    can demonstrate a positive serology or a

5    positive titer to all vaccines except Polio

6    could get an exemption from this shot?

7         A.    It's not an exemption and it's not

8    for all vaccines. It's only for Measle,

9    Mumps, Rubella, Hepatitis B and Varicella.

10   It shows that they have immunity to that

11   vaccine and then they wouldn't have to get

Page 27

12    that vaccine.  It's not an exemption. It's

13    not considered an exemption.

14         Q.    What is it considered?

15         A.    If the child has immunity -- the

16    child may have built up immunity, antibodies

17    to those vaccines, because he may have had a

18    disease at one time or may have had the

19    vaccine and built up immunity.

20         Q.    So the purpose of your job with

21    regard to this is to determine a child's

22    immunity either through serology or proof of

23    vaccines; is that correct?

24         A.    Yes.

25         Q.    Is there any other way that one can

1                    JULIA SYKES              33

2    demonstrate serology -- immunity?

3         A.    No.   The doctor will send -- do the

4    blood test.  They will send in the lab report

5    as well and a note saying that the child has

6    immunity.

7         Q.    Do you review that?

8         A.    No, I don't.

9         Q.    Who does that?

10         A.    It's reviewed by a supervising

11    medical doctor.

12         Q.    A medical doctor? Do you know who?

13         A.    At this time it's a Dr. Sheila

14    Poleski (phonetic).

15         Q.    Poleski?

16         A.    Uh-huh.

SYKES DEPO

17      Q.   What else did you talk about that

18   day at District 75?  You said you talked

19   about required vaccines, the new requirement

20   for Varicella, the serology.  How about the

21   flu vaccines; did you talk about the flu

22   mandate?

23      A.   No, I did not.

24      Q.   Do you have any information you

25   could -- what do you know about the flu

1                JULIA SYKES              34

2   mandate scheduled for September?

3      A.   I know it's going to be a

4   requirement for the younger students.

5   However, there's no exclusionary policy

6   attached to it because parents may opt out of

7   it, but they're going to be offering the flu

8   vaccines to elementary schools and that's

9   through Dr. Jane Zucker's office.

10      Q.   Did I understand you said that --

11   withdrawn.

12           When is the flu mandate going into

13   effect in New York City for the

14   pre-schoolers?

15      A.   September.

16      Q.   September coming up.  Did you say

17   there was an exclusionary rule?

18      A.   No.

19      Q.   You said there's no exclusion?

20      A.   Right.

SYKES DEPO
21     Q.   So a child can't get an exemption?

22     A.   No.  What it means -- no

23   exclusionary means that they're not excluded

24   from school because they do not have the

25   vaccine --


1                    JULIA SYKES            35

2      Q.   Oh, I misunderstood.

3      A.   -- they do not have the flu

4   vaccine.

5      Q.   So a child attending school -- a

6   preschooler attending school in September has

7   a right to refuse that shot?

8      A.   The parent has a right.

9      Q.   The parent, of course.  The rights

10   of the parents being imputed to the children,

11   right, or the other way around.

12                    MS. FINN: Hold on one

13             second.

14     A.   It is a mandate, however they will

15   not be excluding the child from school.

16                    (Whereupon, an off the

17             record discussion was held at this

18             time.)

19     Q.   You didn't discuss that, the flu

20   issue?

21     A.   No, I didn't.

22     Q.   What else did you talk about that

23   day?

24     A.   Vision screening, the requirement

25   for vision screening.

Page 30

Case 1:12-cv-00984-VEK-L-Boo-Document 52-41 03/2-Filed 06/19/2068 Page 3130 of 116 PageID #: 576

1          JULIA SYKES          36

2          Q.   With respect to your day-to-day

3    tasks, do you review requests for exemptions

4    for vaccines?

5          A.   Yes, I do.

6          Q.   What are the grounds in New York

7    City for an exemption to vaccines?

8          A.   A patient has to write a letter.

9    If the parent is requesting a religious

10   exemption, they have to write a letter

11   explaining what their religious beliefs are

12   in their own words.  They have to explain the

13   religious principles behind not getting an

14   exemption and then if they're opposed to all

15   vaccines, they must date it. If not, if it's

16   one particular vaccine, they have to indicate

17   what the religious principles are behind not

18   getting that particular vaccine.

19         Q.   Are there other reasons, other

20   grounds for an exemption?

21         A.   They can have a medical or

22   religious exemption.

23         Q.   Is that the only reason?

24         A.   That's the only ones.

25         Q.   What if somebody wants a religious

1          JULIA SYKES          37

2    exemption, but they can't articulate their

Case 1:12-cv-00984-WEK-BLB Document 51-41-3 Filed 06/19/06/19/06 Page 323 of 116 PageID #: 577

3    religious beliefs in a written statement?

4        A.   That's fine.  They don't have to,

5    you know, articulate it. You know, it's not

6    based -- the review of the religious

7    exemption is not based on how the parent

8    words the letter.  It just has to be in their

9    own words.  They have to explain in their own

10   words why they're requesting this exemption.

11       Q.   My question to you is: What if they

12   can't explain it in their own words?  What if

13   they can't write?

14       A.   Well, if they can't write, I assume

15   they would have an interpreter or someone to

16   write it for them.  It has to be in their own

17   words.  They just can't pull it from the

18   internet.

19       Q.   How often do you get exemptions

20   pulled from the internet?

21       A.   A lot.

22       Q.   How often do you get the same

23   statements?

24       A.   A lot.

25       Q.   Out of the number of -- how many

♀

1                    JULIA SYKES              38

2    exemptions -- let's talk about religious

3    only.  How many religious exemption requests

4    do you review each year?

5        A.   Close to maybe 1200 or more.

6        Q.   So you get approximately 1200

7    religious exemption requests a year?  How

Case 1:12-cv-000984-WEK&-B Document 51-13/Filed 06/19/014 68Page 3336 of 161PageID #: 578

8   about medical?

9       A.   I don't review medical exemptions.

10      Q.   Do you know how many the City of

11  New York gets every year?

12      A.   I don't know the number.

13      Q.   Do you have an idea?

14      A.   The number was high this year.   It

15  may be 500.

16      Q.   If it was high -- why was it high?

17  What was it last year?

18      A.   I don't know why it was higher, the

19  request for exemptions were higher in both

20  categories this year, because they're still

21  flooding in now.

22      Q.   Flooding in?

23      A.   Yeah.

24      Q.   Why are they flooding in?  Why do

25  you use that word flooding?

1                   JULIA SYKES            39

2       A.   I shouldn't use the word flooding.

3   They're coming in record numbers this year.

4       Q.   Why is it a record number; what is

5   different about this year?

6       A.   Because this year -- usually in the

7   past by January or February, you know, it

8   dies down.  But this year, even up until

9   yesterday I received five of them.

10      Q.   How many do you get a day?

11      A.   Maybe ten to twenty.

SYKES DEPO

12      Q.   So you get -- are we talking

13   religious -- yes, you said that.

14      A.   Religious, yes.

15      Q.   Ten to twenty religious exemptions

16   a day?

17      A.   Yeah.  And sometimes they're -- the

18   one's that are coming in are because they're

19   sending in additional information to me.

20      Q.   All right, but let's talk about new

21   ones.  Do you get ten to twenty new religious

22   exemptions a day?

23      A.   Yes, from the beginning of the

24   school year up until January or February,

25   yes.


1                   JULIA SYKES              40

2       Q.   How many of them get approved?

3       A.   Most of them do get approved.

4       Q.   Do you know what percentage are

5    rejected?

6       A.   Percentage wise, no, I don't.

7       Q.   Do you have final authority for

8    approving or denying an exemption, a

9    religious exemption?

10      A.   What do you mean by final

11   authority?

12      Q.   -- withdrawn.

13           If I'm a parent in New York City

14   and I want a religious exemption, tell me

15   what I need to do.

16      A.   Okay. The parent writes a letter

Page 34

SYKES DEPO

17    explaining what their religious beliefs are.

18    Once the letter comes into my office, before

19    I read the letter I pull the immunizations,

20    see if there's any history of immunizations

21    on file either in ATS or in the CIR before I

22    read the letter.

23         Q.   Hold on.  May I ask you, why do you

24    pull the record before you read the letter?

25         A.   Because I don't want to blindly

1                    JULIA SYKES            41

2     read this letter, so I want you know, before

3     -- I don't want to blindly read the letter

4     before I have documentation on what the past

5     history is of this child.

6          Q.   How relevant is the past history to

7     the religious beliefs?

8          A.   Because when I read the letter, the

9     letter should say that although I practiced

10    immunizations in the past, my beliefs have

11    changed.  I don't want to be bias and look at

12    the letter first and then look at what was

13    done in the past and it doesn't say something

14    in there -- make a reference to immunizations

15    that they had in the past.

16         Q.   So by pulling the record -- and

17    where are you pulling the record from, ATS --

18         A.   I pull it from ATS.

19         Q.   -- and CIR?

20         A.   Yes, ma'am.

SYKES DEPO

21    Q.   So you use both resources?

22    A.   Yes.

23    Q.   So you get a -- I'm a parent.   I

24    give you a letter for an exemption and before

25    you read my letter, you go to ATS and CIR.

1                    JULIA SYKES          42

2    And for what reason do you go to ATS and CIR?

3         A.   To see which documentation the

4    parent submitted to the school when they

5    first registered, because when they register

6    for school they had to give proof of

7    immunizations.

8         Q.   What do you do with that

9    information that you get from CIR and ATS;

10   what do you do next?

11        A.   Once I have the information from

12   both places, then I read the letter and see

13   if the parent made any reference to

14   immunizations within the body of the letter.

15        Q.   If they made any references to

16   previous immunizations, right?

17        A.   Right.

18        Q.   And what if they didn't do that?

19        A.   Then I would send home a letter

20   requesting additional information from the

21   parent.

22        Q.   What additional information do you

23   ask for?

24        A.   I ask them to explain in their own

25   words why they're requesting the exemption,

Case 1:12-cv-00984-WEK6LBoDoumente12-41 08/Fil20 06/19/1846 8Page 3730 d116PageID #: 582

1               JULIA SYKES                43
2    and then the second question is what is your
3    religious principles, are you opposed to all
4    immunizations and if not, if it's a
5    particular vaccine, immunization, what is
6    your religious principles opposing getting
7    that vaccine.
8          Q.    Have you ever received any letters
9    from parents that struck you as odd or
10   potentially negligent?
11         A.    No, I don't look at them like that.
12         Q.    Well, what if a parent writes to
13   you and says that they reject Western
14   medicine?
15         A.    Then I would send them an
16   additional information letter.
17         Q.    What if they wrote in the letter
18   that their children, regardless of how sick
19   they were or how in need, they would refuse
20   medical care for religious reasons?  What
21   would you do with a letter like that?
22         A.    Well, it has to be based on
23   religion.  Although, they don't have to
24   belong to a religious organization.  The
25   religious exemption letter has to be based on


1               JULIA SYKES                44
2    religion, so if they put something like that,

SYKES DEPO

3   that's medical, that's not religion.

4        Q.   Well, what if they said -- what if

5   they were Christian Scientists or let's say a

6   Jehovah's Witness and -- withdrawn.

7             Let me ask you this: Have you ever

8   come across a request for a religious

9   exemption that you were concerned about and

10  reported to authorities about a potential

11  negligence or other --

12       A.   No.

13       Q.   So you get approximately ten to

14  twenty letters a day, and out of all of those

15  for the last 25 years never once --

16       A.   I haven't reviewed -- I have not

17  done exemptions for 25 years.

18       Q.   How long have you done the

19  exemptions?

20       A.   I've done exemptions for nine

21  years.

22       Q.   That's still a long time. So in the

23  nine years with all these exemptions, you

24  never read anything unusual that concerned

25  you?


1                    JULIA SYKES              45

2        A.   Well, in the beginning -- in the

3   very beginning of the request for exemptions,

4   they had some stuff in there, you know, how

5   they worship different things and yeah, that

6   concerned me, but I can't put my opinions

7   into anything that I read.  I have to follow

Case 1:12-cv-00984-WEK6LB ocDmcumetn5t-6141-03/2iFle0d 06/19/0468Pagage893630f di6lPageID #: 584

8      the processes in place and I send them a

9      letter explaining, you know, for them to send

10     additional information answering those

11     questions the best they can.

12          Q.    How many of the religious exemption

13     letters do you get that you approve in the

14     first instance; what percentage?

15          A.    I don't have the percentage.   I

16     can't give you a percentage.

17          Q.    In your experience, how many of

18     them are approved without supplemental

19     information?

20          A.    Maybe half.   I can't say the

21     number, maybe half.

22          Q.    And then out of those that do not

23     make the first cut, you send them

24     supplemental information?

25          A.    Yes.

♀


1                     JULIA SYKES           46

2           Q.    Is it the same request to every

3      family?

4           A.    It's the same form letter, yes.

5           Q.    It's a form letter. And out of

6      those parents that respond back to you with

7      supplemental information, how many of those

8      are approved?

9           A.    Maybe half of those and then the

10     other half may be denied.

11          Q.    What happens when someone is

12    denied?

13        A.    Then they're sent for an appeal

14    interview with our supervising -- I mean, CFN

15    health liaison.

16        Q.    What is CFN?

17        A.    Children First Network.

18        Q.    What is Children First Network?

19        A.    That's what they're calling the

20    health liaisons within the networks. They

21    call them -- it's called CFNs, but they're

22    health liaisons within the networks.  Instead

23    of having districts, they're networks.

24        Q.    What is the purpose of this CFN;

25    what is the CFN?  I'm not really clear.

 ♀

1                    JULIA SYKES                47

2        A.    They're the health person, the

3    person responsible for health and other

4    issues at the network level.

5        Q.    Oh, right.  I see.  Network

6    district. Okay.  I get it now.

7              So someone who is denied an

8    exemption, they go for an appeal interview

9    with the CFN?

10        A.    Right.

11        Q.    How many CFNs does the City of New

12    York have; do you know?

13        A.    Sixty-two.

14        Q.    Sixty-two. And they're located at

15    the district level, right?

16        A.    Right.

SYKES DEPO

17      Q.   Do you know how many interviews the

18   CFNs do a year regarding religious

19   exemptions?

20      A.   I don't have that number.

21      Q.   Can you approximate?  They are

22   coming from your office, right?

23      A.   The denials are coming from my

24   office, yes, but I don't have the number.

25           MS. FINN: Can we get some

1            JULIA SYKES              48

2            information on those numbers?

3            MR. CARTER: Put it on your

4            letter.  I'll consider all these,

5            but I need to sit down with the

6            client and figure it out.

7            MS. FINN: And I don't want

8            to burden you either, too much.

9      Q.   So you have sixty-two CFNs that --

10   is all they do -- is all the CFN does is

11   interview a parent?

12      A.   No, that's not their only job.

13      Q.   What are their other --

14      A.   They may be doing transportation,

15   they may be doing safety, they wear a number

16   of hats.  Health is not their one hat that

17   they wear.

18      Q.   How about regarding interviews with

19   parents, out of all of their hats, is the

20   only time they ever interview parents is for

Page 41

Case 1:12-cv-00984-WEK6-B Document 51-613/21/2006/19/0868Page 42of 116 PageID #: 587

21    a religious exemption?

22        A.    I have no idea if that's the only

23    time they interview parents.

24        Q.    Do you do any training with the

25    CFNs?

1

2        A.    Yes.

3        Q.    And you don't know what else they

4    do?

5        A.    I don't do the training in the

6    other areas that they work in.

7        Q.    So with regard to religious

8    exemptions and the training of the CFNs --

9    you say there's sixty-two of them.  Have you

10    met with all sixty-two?

11        A.    Yes --

12        Q.    How often?

13        A.    -- unless there's a new person that

14    just came on board.

15        Q.    How often do you meet with them?

16        A.    Once a year, but I talk to them

17    regularly via e-mail or phone.

18        Q.    When you meet once a year, why do

19    you meet?

20        A.    They have a focus meeting not only

21    on immunization, but on other issues, and

22    immunization may be one of their topics.

23        Q.    During these focus meetings, do you

24    provide training to the CFNs?

25        A.    If they ask for it, yes.

Case 1:12-cv-00984-VEC-KBL Document 58-41 Document 68 Filed 06/19/14 Page 44 of 116 PageID #: 588

1       JULIA SYKES                    50

2       Q.   Similar to what you described to me

3   for District 75?

4       A.   Right.

5       Q.   But do you generally give an

6   overview or any routine training to the CFNs,

7   or is it only if they ask for it?

8       A.   I give -- in the beginning of the

9   school year, they have one -- a meeting,

10  where the new CFNs will come in, personnel

11  will come in and they have a meeting and it

12  covers varius topics, and one of them may be

13  immunizations.  However, their cluster

14  leaders do meet once a month and you know,

15  it's not only immunizations that they

16  discuss.  They discuss other things as well,

17  other topics.

18      Q.   What's a cluster leader?

19      A.   They're the one point person that

20  instead of all sixty-two health liaisons

21  attending a meeting, one person is to attend

22  and bring back the information for the other

23  liaisons within their network.

24      Q.   What training does the CFN get from

25  the City of New York involving denial or

1       JULIA SYKES                    51

2   approval of religious exemptions?

SYKES DEPO

3          A.   Well, they're given an overview of

4    what the requirements are, the procedure for

5    a religious exemption, and they're given the

6    set of five questions that should be asked at

7    the interview to the parent so they can get a

8    better understanding of why the parent is

9    opposing immunizations.

10         Q.   What are the overview requirements

11   that CFNs are given?

12         A.   The questions?

13         Q.   Well, you said there was an

14   overview requirement and then procedures.

15         A.   We let them know what the

16   requirements are -- the immunization

17   requirements are, what the religious

18   exemption procedure is they should follow --

19   that we all follow, and the interview

20   questions -- and the set of questions they

21   should ask at the interview.

22         Q.   The religious exemption procedure,

23   is that documented anywhere?

24         A.   Yes.

25         Q.   Where is that documented?

1                   JULIA SYKES              52

2          A.   It's on our website.

3          Q.   Is that a public website?

4          A.   Yes.

5          Q.   So it's the same information for

6    the public what one has to do to get a

7    religious exemption; it's on your website?

Page 44

Case 1:12-cv-00984-WEKL Bo Document 51-41 03/27/15 06/19/06 68 Page 45 of 161 PageID #: 590

SYKES DEPO

8      A.    It's -- no, the process is not on

9   the website.  No, it's not.  I'm sorry.  The

10  process is not on the website.

11     Q.    Where is it?

12     A.    It's given to the schools.  It's on

13  the principal's portal.

14     Q.    It's on the principal's portal?

15     A.    Yes, ma'am, portal.

16     Q.    And that's for the principal only,

17  right?

18     A.    That's for the school, yes.

19           MS. FINN: Chuck, I'd like

20           that if you haven't given it to me

21           already.

22           MR. CARTER: I'll look into

23           that.

24           THE WITNESS: I gave it to

25           you.



1            JULIA SYKES              53

2            MR. CARTER: You believe it's

3        in the documents you produced?

4            THE WITNESS: Yes, I gave it

5        to you.

6            MR. CARTER: Okay.

7            MS. FINN: Okay. Good enough.

8        I only got them yesterday. Can you

9        believe that?

10           MR. CARTER: You got them a

11       few weeks ago.

Page 45

SYKES DEPO

12    MS. FINN: No, the mail is

13    still getting forwarded from Sandy.

14    MR. CARTER: Do you want to

15    look through and find it?

16    MS. FINN: No, no. I mean,

17    I've seen all this stuff before.

18    I'm just kidding.  I haven't seen

19    it, but I will look at it.

20    Q.    Okay. So tell me a little bit about

21    the religious exemption procedures that are

22    available to principals in their private

23    portals.

24    A.    The procedure says that if a parent

25    submits the letter requesting the exemption,


1                    JULIA SYKES              54

2    the school is to forward the information to

3    the CFN health liaison and then it's

4    forwarded to me.  And while it's under

5    review, the student can remain in school.

6    Q.    And when the letter is submitted to

7    this CFN, what does the CFN do with it?

8    A.    They send it to me.

9    Q.    So they're just basically a pass

10    through? They do no --

11    A.    Right, because they need to know

12    because they're responsible for those

13    schools.  So they need to know when a parent

14    is requesting an exemption, so in case they

15    have to appeal -- the parent appeals, they

16    will have that information.

SYKES DEPO

| | |
|---|---|
| 17 | Q. Got it. So a parent submits a |
| 18 | letter, it goes to the CFN basically as pass |
| 19 | through just to keep an eye on whatever, the |
| 20 | things. And then it goes to you and then you |
| 21 | pull out -- you go -- before you read the |
| 22 | letter, to the CIR and the ATS, right? |
| 23 | A. Right. |
| 24 | Q. And then you do that -- why do you |
| 25 | do that again? Why do you go to CIR and ATS? |

| | JULIA SYKES | 55 |
|---|---|---|
| 1 | | |
| 2 | A. Because I need to see what the | |
| 3 | history is of this child. | |
| 4 | Q. Why does the history of the child | |
| 5 | effect the parents religious beliefs? | |
| 6 | A. Because I don't want to be biased | |
| 7 | when I read the letter and just say -- you | |
| 8 | know, I need to see what the -- see if the | |
| 9 | parent made any reference to whatever vaccine | |
| 10 | the child had. | |
| 11 | Q. And if they haven't, it's an | |
| 12 | automatic denial? | |
| 13 | A. No, I ask for additional | |
| 14 | information. | |
| 15 | Q. And if they have made a reference | |
| 16 | to previous vaccines, then that's an | |
| 17 | approval? | |
| 18 | A. Most of the time, yes. It's not a | |
| 19 | denial unless the letter -- if they make | |
| 20 | reference to it in the letter, and it doesn't | |

Page 47

SYKES DEPO

21    have to be worded this way, but in the past I

22    practiced immunization, however my views have

23    changed and they go on to explain that, yes,

24    it is approved.

25         Q.    And if a parent immunized and then


1                      JULIA SYKES                    56

2    stopped and doesn't explain that in the

3    letter, you want supplemental information?

4         A.    Right.

5         Q.    So let's say that you have a parent

6    that hasn't discussed their prior vaccination

7    and you've submitted -- you've requested

8    supplemental information. What type of

9    supplemental information do you request?

10        A.    They have to answer those four

11   questions -- the three questions.

12        Q.    Tell me what the three questions

13   are.

14        A.    They have to explain in their own

15   words what their religious beliefs are. They

16   have to explain the religious principles

17   behind requesting the exemption and then if

18   they're opposed to all vaccines -- if they're

19   opposed to all vaccines and if not, what's

20   their objections to a particular vaccine.

21        Q.    Does it matter to you if a parent

22   objects to all vaccines or a particular

23   vaccine; does that make a difference?

24        A.    No, it doesn't.

25        Q.    Then why do you ask it?

<pre>
 1                    JULIA SYKES              57
 2         A.   Because that's the questions that
 3    was -- that were prepared by the law office.
 4    I just follow the questions.  I don't write
 5    those questions.
 6         Q.   Do you think it's relevant that --
 7         A.   Those questions are also used at
 8    the State level as well.
 9         Q.   Do you think it's relevant if a
10    parent has an objection -- withdrawn. Let me
11    restate that.
12              Do you think it's relevant to the
13    sincerity of a parents religious beliefs
14    whether or not they object to all vaccines or
15    one or two in particular; is that relevant in
16    the decision making?
17         A.   No.
18         Q.   But you do ask it?
19         A.   Yes.  The questions are asked, yes.
20         Q.   So what do you do with the answer
21    then if it's not relevant?
22         A.   Well, if they answer those
23    questions the way that it was -- if they
24    answer those questions, then yes, we do -- it
25    is relevant.


 1                    JULIA SYKES              58
 2         Q.   How is it relevant?
</pre>

Page 49

SYKES DEPO

3     A.   Because if they -- if they've had

4    vaccines in the past and then now they

5    stopped, you know, what is the reason behind

6    that, but if they like -- say for instance we

7    had a case, the parent got a vaccine in

8    August of 2013, in October they became --

9    they submitted a religious exemption.

10    Q.   I understand that.  But my question

11    was not about the temporal sequence between,

12    you know --

13    A.   Okay.

14    Q.   -- getting a shot in August and

15    then being born again in October.

16    My question to you is the relevancy

17    of whether or not someone objects to all

18    vaccines or a vaccine in particular.  That's

19    what I was asking, and I wanted to know what

20    relevance or impact does that answer have on

21    your decision making?  If it's none, then

22    that's the answer.  Is it none?

23    A.   Umm, yes.

24    Q.   It has no impact?

25    A.   No.



1             JULIA SYKES        59

2    Q.   But you do ask it because that is

3    the procedures set up by the City of New

4    York?

5    A.   That's one of the questions that

6    they -- right.

7    Q.   And that's your job --

Case 1:12-cv-00984-WEK6-BO Document 51-41 03/27/10 06/19/14 68 Page 54 of 161 PageID #: 596

SYKES DEPO

8      A.   Yes.

9      Q.   -- and that's what you're supposed

10   to do.  I understand that.

11         You said there were three questions

12   and one was all vaccines or a particular

13   that's in the supplemental. Then you told me

14   that you ask for an explanation regarding

15   religious principles.

16      A.   Yeah.  These are questions that are

17   laid out from -- that were given -- laid out

18   in the letter.  It's a form letter that's

19   prepared by our legal services, and these are

20   the questions that are laid out and we pulled

21   the questions from the State.  It's not like

22   we just sat around and decided these are the

23   kind of questions we're going to ask.

24      Q.   I know that, and I know that your

25   office is mindful of the rights of these

1                  JULIA SYKES                60

2   parents.  That I know for sure.

3      A.   Yeah.

4      Q.   But I want to ask you though, about

5   these three questions that are supplemental.

6   We've discussed that all vaccines or a

7   particular vaccine, that's not really

8   relevant to you.

9         Now, I'm asking you about religious

10   principles. I understand it comes from the

11   State, but is it relevant to you what the

Page 51

Case 1:12-cv-00984-WEK-L Document 52-43 3/Filed 06/19/0468 Page 525 of 116 PageID #: 597

12    religious principles are because you're

13    reviewing it, right?

14        A.    Yes, because if a parent -- a

15    parent most of the time will submit

16    documentation that has scriptures in it.

17    However, they don't explain what the

18    scriptures mean to them, and I look for that.

19    You know, like they put a list of scriptures,

20    but if they don't make a notation of what

21    this scripture means to them --

22        Q.    So if a parent explains or

23    interprets certain religious principles that

24    are acceptable to you, they get an exemption?

25        A.    That are acceptable to me?  I don't

1                    JULIA SYKES                61

2    put my own views into that.

3        Q.    Okay.  If a parent asserts certain

4    religious principles --

5        A.    Right.

6        Q.    -- and they fail to explain or

7    interpret -- withdrawn.

8            If a parent asserts scripture in

9    support of religious principles contrary to

10    vaccinating, if they fail to explain or

11    interpret that scripture to your

12    satisfaction, are they denied an exemption?

13        A.    To my satisfaction -- they may

14    explain it in their own words.  It doesn't

15    have to be how I would explain it.  I don't

16    put my own opinion into what I'm reading.

SYKES DEPO

17      Q.   I understand.

18      A.   I read it to see if the parent puts

19   a scripture down and to see if they explained

20   what that scripture means because me reading

21   it, the scripture may mean something else to

22   me.  So I don't want to put my own opinion

23   into what I'm reading.

24      Q.   May I ask if you practice any

25   religion?

1                  JULIA SYKES            62

2      A.   Yes, I am -- I'm Christian.

3      Q.   And were you trained in Christian

4   teachings and scripture?

5                MR. CARTER: I'm going to

6                object to this.  I believe this

7                invades her personal privacy.

8                MS. FINN: I agree. Excuse

9                me.

10               Can I go to the ladies room, if you

11               don't mind?

12               MR. CARTER: Five-minute

13               break?

14               MS. FINN: Yeah.  Is that all

15               right?

16               (Whereupon, a short break

17               was taken at this time.)

18      Q.   So let me just ask you a couple of

19   background questions, and then I'll get right

20   back to where we were.

Page 53

SYKES DEPO

21    A.    Uh-huh.

22    Q.    Have you done depositions like this

23  before involving religious exemptions?

24    A.    No.

25    Q.    Have you ever testified in any


1              JULIA SYKES              63

2   trials regarding your decisions to approve or

3   deny an exemption?

4     A.    No.

5     Q.    Have you ever been questioned by

6   any attorneys?

7     A.    No.

8     Q.    We were talking about religious

9   principles, and I want you to tell me a

10  little bit more about why explaining and

11  interpreting scripture is important.

12    A.    No.  They don't have to explain --

13  putting in a scripture is not important.

14  However, if they were to put a scripture in a

15  document, yes, it should say that scripture A

16  means this to me or...

17    Q.    How do you identify what is a

18  religious principle?

19    A.    Well, they would -- they will say

20  that because of their religious beliefs, you

21  know, they believe in a higher power or they

22  would describe what they believe. They

23  wouldn't just, you know, put because of my

24  religious beliefs because the state says I

25  can ask for an exemption.

              Page 54

SYKES DEPO

| | JULIA SYKES | 64 |
|---|---|---|

1                        JULIA SYKES         64

2     Q.   Do you get that a lot?

3     A.   Yeah.

4     Q.   I bet you do.  But again, my

5  question is:  What is a religious principle?

6  Give me an example please, of what is a

7  religious principle.

8     A.   They would explain what their

9  religion means to them.  The principles would

10  be like, this vaccine, you know, is against

11  what I believe, that the creator or whoever

12  the creator -- or whatever their beliefs are

13  -- whatever their beliefs are said they

14  should oppose -- they shouldn't have, they

15  shouldn't do.

16     Q.   Have you ever received any

17  religious exemption statements that were

18  exceptionally well written in your opinion?

19     A.   Yeah, I have.

20     Q.   What features did those

21  exceptionally well-written exemptions have?

22     A.   Most of the well written ones were

23  from the internet.

24     Q.   I'm sorry, from the internet?

25     A.   Yes, yes.

1                        JULIA SYKES         65

2     Q.   Did you approve those?

SYKES DEPO

3  A. No. I would ask because instead of

4 the parent when they pulled the letter from

5 the internet, putting it in their own words,

6 they would send it the way they are, plug in

7 their names and I would send a letter asking

8 for additional information.

9  Q. Isn't it true though, that a

10 Christian -- say a Catholic -- let's say

11 Christians, basically share the same

12 scripture?

13  A. Well, they all should share the

14 same bible, yes.

15  Q. So therefore, wouldn't it be

16 reasonable to assume that given the limited

17 material in the bible, that Christians would

18 assert similar religious principles, rely on

19 similar scripture?

20  A. They should.

21  Q. So if ten families who were

22 Christian rely on the same religious

23 principles and the same religious scripture,

24 regardless of where they've gotten it, the

25 internet, the bible or whatever, would you

1       JULIA SYKES   66

2 reject those?

3  A. Well, very few of them have

4 scriptures in them, and most of the ones that

5 come in that do have scriptures in them do

6 come from the internet. And like I said, I

7 don't outright reject them. I will ask for

8    additional information if they have not -- if

9    -- once I look at the history of whatever

10    vaccines that they have is there and have not

11    addressed those issues.

12        Q.   How do you know it doesn't come

13    from the bible if it's the same scripture?

14        A.   How do I know what doesn't come --

15        Q.   How do you know that the parents

16    haven't drawn -- whether the same ten parents

17    haven't drawn from the bible?  How do you

18    know it's from the internet and not the bible

19    if it's the same scripture?

20        A.   Because the format of the letter is

21    the same.  Most of the letters that I've seen

22    that are well written like that is the same

23    letter, it's just that the name changed.

24        Q.   Isn't it possible though, that

25    Christians have the same religious beliefs?

1               JULIA SYKES         67

2        A.   They should.

3        Q.   Isn't it reasonable to assume that

4    if they share the same religious beliefs,

5    they would rely on a similar written

6    statement regardless of its source?

7        A.   But it has nothing to do with their

8    religious organization.  It has to do with

9    what they believe.

10        Q.   But isn't the law in New York State

11    -- or the law in the country is that someone

Case 1:12-cv-00984-WEK6LB Document 51-61 03/27/2006 19/08/68 Page 585 df d161 PageID #: 603

12    does not have to belong to a religious

13    organization?

14        A.    That's what I just said, yes.  They

15    do not have to belong to a religious

16    organization.  They have to -- it has to be

17    their own religious beliefs.

18        Q.    Do you know how many religions have

19    be identified in the world --

20        A.    No, I don't.

21        Q.    -- approximately?

22        A.    No.

23        Q.    How many different types of

24    religious beliefs have you reviewed, if you

25    know, over your nine years?

♀

1                    JULIA SYKES            68

2        A.    Well, most of the letters do not

3    state a religion.  Lately, there has been

4    parents that have stated that their Catholic

5    beliefs do not believe in immunizations.

6    Those are the only ones that I've seen.

7        Q.    Have you ever come across a

8    religion that you've never heard of?

9        A.    Yes.

10       Q.    How many times?

11       A.    A few times.

12       Q.    Then how do you know -- did you

13    approve or deny those exemptions?

14       A.    I would look it up and see what

15    type of religion it is, what are their

16    beliefs.  I don't know -- and if I'm not

SYKES DEPO

17    clear -- if I see a religion that I'm not
18    familiar with, I look it up and see what type
19    of religion this is -- what religion it is.
20         Q.   Where do you look that up?
21         A.   I look it up on the internet.
22         Q.   So you go to the internet to get
23    information regarding religious principles,
24    but if a --
25         A.   Well, not really religious

♀

1                    JULIA SYKES          69
2    principles -- to see even if this is a real
3    religion.  I don't look into depth to make a
4    comparison to what they wrote to -- what
5    their beliefs are that I found online. I just
6    want to see if it's a real religion that they
7    put in their letter because they do not have
8    to belong to a religious organization, so
9    they didn't have to put that in their letter.
10        Q.   But you go to the internet to
11   identify whether or not a religion is real?
12        A.   Right.  If I don't know what it is,
13   yes.
14        Q.   And then if you don't know what it
15   is, how do you understand what are the
16   religious principles contrary to vaccinating?
17        A.   I don't use it based on their
18   religion that they belong to.  I just base it
19   on what the parent wrote as far as what their
20   religious beliefs are.  It has nothing to do

21    with what religion they belong to.

22         Q.   Have you ever had anybody tell you

23    they belonged to a religion and you couldn't

24    identify whether it truly existed on the

25    internet?


1                    JULIA SYKES            70

2         A.   I've had some that I couldn't find.

3    I didn't base my opinion on -- decision on

4    what I found on the internet or didn't find

5    on the internet.  I just base it on what the

6    parent wrote.

7         Q.   So if a parent comes to you with a

8    religion you've never heard of, how do you

9    know whether or not they're properly

10   explaining or interpreting the principles

11   contrary to vaccinating?

12        A.   Because I don't use the fact that

13   they belong to a particular religion because

14   they don't have to belong to a religion to

15   have religious beliefs.

16        Q.   Okay.  And we talked about this a

17   little bit, in your own words part.  What if

18   someone comes to you and they really cannot

19   articulate their religious beliefs in their

20   own words?  Do they get denied an exemption?

21        A.   No.  I will send back a letter

22   asking them for additional information if I

23   don't understand what they wrote.

24        Q.   And in the additional information

25   is a statement in your own words, religious

SYKES DEPO

1                    JULIA SYKES               71
2    principles and whether or not they object to
3    all vaccines or particular vaccines; is that
4    correct?
5         A.    That's correct.
6         Q.    What type of -- generally, what
7    type of religious training have you received,
8    if any?
9         A.    What type of religious training I
10   received?  I'm really involved in the church.
11        Q.    Are you?
12        A.    Yes, I am.
13                    MR. CARTER: I'm sorry.  That
14              may not -- you meant training in
15              connection with her job?  In other
16              words, not her personal --
17                    MS. FINN: I meant with her
18              job, but --
19        A.    Not with my job, no. I have none.
20        Q.    But I'm involved with my church too
21   so. I did mean with your job.
22        A.    No, none.
23        Q.    Do you know anyone in -- any of
24   these CFNs or any of your direct supervisors
25   that have had any specific training regarding

1                    JULIA SYKES               72
2    religion and the granting or denying of

SYKES DEPO

3 exemptions?

4   A. No.

5   Q. Have you ever asked for training?

6   A. No.

7   Q. And how does the City of New York

8 qualify an individual to make these types of

9 determinations?

10   A. Well, I guess you just have to be

11 able to read the documents that are before

12 you. There's no specific training that you

13 have to have, you just have know that they do

14 not have to belong to a religion to request

15 an exemption. And if the letter -- if they

16 explain what their beliefs are answering

17 those questions, it's given.

18   Q. Have you ever come across anyone --

19 any of these CFNs that exhibit religious bias

20 or intolerance?

21   A. No.

22   Q. So out of these sixty-two people,

23 these sixty-two CFNs at these network levels,

24 how do you know they're qualified to

25 determine religious principles contrary to

1       JULIA SYKES    73

2 vaccinating; how do you know that?

3   A. I don't know that and I don't

4 believe that they have to have any religious

5 training in order to ask a question.

6   Q. How about if they're exhibiting

7 racial -- religious intolerance or some kind

SYKES DEPO

8    of bigotry towards religion or something like
9    that?  Do you have any methodology or
10   procedure for identifying that and dealing
11   with it?
12        A.   No.
13        Q.   Has it ever come up?
14        A.   No.
15        Q.   You had stated previously that an
16   individual does not have to be a member of a
17   particular religion.
18        A.   Right.
19        Q.   Do you remember reviewing a
20   religious exemption for little Mary Check?
21   That's the reason we're here today.
22        A.   About two years ago, yeah.
23        Q.   Do you remember making a statement
24   or submitting an affidavit in connection with
25   that litigation?


1                     JULIA SYKES              74
2         A.   Yes.
3         Q.   What do you know about the Catholic
4    diocese here in New York City and they're
5    view on vaccines?
6         A.   It's my understanding that the
7    Catholics do believe in immunizations --
8    Catholic schools require immunizations.
9         Q.   Does that in any way effect your
10   decision to grant or deny Mary Check's
11   immunization exemption?

Page 63

Case 1:12-cv-03009-KBF Document 51-13 Filed 06/19/13 Page 64 of 116 PageID #: 609

12    A.    No, because I didn't look at her

13    religion.  No, I didn't.

14                    MS. FINN: One second,

15              please.

16    Q.    Where did you get your information

17    regarding the dioceses views on vaccines and

18    Catholicism?

19    A.    Well, I received a phone call from

20    one of the head -- one of the head of the

21    Catholic schools whose' parent was requesting

22    -- they had a child in Catholic school and

23    one in public school and she was requesting

24    an exemption from immunizations, and he

25    stated that they do believe in immunization

1                    JULIA SYKES           75

2    and if this is something that she's pushing,

3    that she would not be able to get whatever

4    percentage of her tuition, and then Mary just

5    went away.  I don't know what happened to

6    her.

7    Q.    Well, how did that effect your

8    decision making with regard to Mary Check?

9    A.    It had nothing to do with that.

10    Q.    The diocese position in New York

11    City that you just stated had absolutely

12    nothing to do with your denial of Mary

13    Check's exemption?

14    A.    No.  The Catholic schools -- my

15    understanding from the conversation that I

16    had with him was that they do require

SYKES DEPO

17    immunizations. That was the only thing, but I

18    never looked at the Checks' case as far as

19    being a Catholic, you know -- being a

20    Catholic. I just looked at in the beginning,

21    the parent did not request a religious

22    exemption, she requested a medical exemption.

23        Q.   who did you speak to in the

24    dioceses, if you can tell me?

25        A.   I don't know.  It was quite a few

1                   JULIA SYKES              76

2    years ago and it was way before this case.

3        Q.   How long ago?

4        A.   It was a head of a Catholic school.

5    It may have been six years ago.  I really

6    don't know.

7        Q.   How do you know that person was

8    correct in what they told you?

9        A.   I don't know.  I didn't question

10    him, he was questioning me.

11        Q.   But you relied upon that in your

12    determination to deny Mary the exemption?

13        A.   No.  I did not rely on it to deny

14    Mary because Mary was not the student that

15    was in question.  The student that was in

16    question, the parent just withdrew everything

17    and she just -- I don't know what happened to

18    this parent.

19        Q.   I have a copy of your affidavit,

20    the declaration of Julia Sykes in opposition

SYKES DEPO

21  in the plaintiff's motion for preliminary

22  injunction regarding Mary's case.

23      A.   Right.

24      Q.   And in paragraph nine on page

25  three --

1                    JULIA SYKES              77

2                    MS. FINN: Chuck, do you want

3               me to mark this or -- I mean it's

4               part of the pleadings.

5                    MR. CARTER: Yeah, I think

6               you can just refer to it.

7       Q.   I was wondering, if you could be so

8   kind, could you just read paragraph nine for

9   me because I want to question you about that

10  and your determination with Mary?

11      A.   In reviewing her submission, I did

12  not discern a genuine and sincere religious

13  impetus to her objections.  Rather her

14  objections appear philosophical and moral.

15  She did not assert that the tenets of

16  Catholicism prohibits immunizations and it is

17  my understanding that all New York City

18  public schools require immunization in the

19  normal course.

20      Q.   Can I have that back, please?

21           Was that statement in any way based

22  upon that communication you had with the

23  person you mentioned a few years back from

24  the Catholic school?

25      A.   It had nothing to do -- I never

                    Page 66

SYKES DEPO

1            JULIA SYKES            78
2  even thought about the man from the Catholic
3  school.  No, because I deal with -- well,
4  private schools will contact me as well as
5  our public schools, although I refer them to
6  Bureau of Immunization for a determination.
7        Q.    If Mr. and Mrs. Check had asserted
8  tenets of Catholicism that prohibit
9  immunization, would you have granted the
10  exemption?
11       A.    My -- no, not for this case because
12  my decision was based on the fact that she --
13  first she requested a medical and then she
14  went for religious, and then I sent her a
15  letter requesting additional information for
16  this child.  And then she went for the
17  interview and the overall decision was based
18  on the documentation that was submitted from
19  the interview.
20       Q.    In reviewing Mary's request for an
21  exemption, did you go to the CIR and the ATS?
22       A.    ATS, yes.
23       Q.    Did you have a hard copy file of
24  Mary's records?
25       A.    Yes, yes.  Well, I pull them for


1            JULIA SYKES            79
2  everybody.  I can't say that there was

SYKES DEPO

3    something for her in there because that was

4    so long ago.

5         Q.   She was young too so I would

6    imagine as the children get older their files

7    get bigger, right?

8         A.   Well, it would get bigger.  It

9    would have documentation from when she was a

10   baby.

11        Q.   Right, yeah. So you don't remember

12   though?

13        A.   I don't recall that, no.

14        Q.   But when you review a request for

15   exemption, you definitely go to the CIR, you

16   definitely go to the ATS?

17        A.   Right.

18        Q.   And do you get a hard copy file?

19        A.   I print it, yes.

20        Q.   Oh, I see, you print.  And it's

21   your testimony that Mrs. Check first made a

22   request for a medical exemption and that was

23   denied; is that your testimony?

24        A.   Yes.

25        Q.   And then because she followed up


1                    JULIA SYKES              80

2    with the religious exemption --

3         A.   Two days later, yes, she did.

4         Q.   -- is that why her religious

5    exemption was denied?

6         A.   No, it wasn't denied initially.  I

7    asked for additional information from her and

Page 68

SYKES DEPO

8      then based on that information it was denied,

9      and then she went for an appeal, but she

10     never appealed the medical exemption which

11     she had an opportunity to do at the time that

12     it was denied.

13          Q.   Yes, I remember that.  I remember

14     that well.

15          So, did you know that little Mary

16     Check had been in school for two years in the

17     City of New York prior to your denial of the

18     exemption?

19          A.   No.

20          Q.   Did you know that little Mary had

21     obtained a religious exemption prior to that

22     application for the medical exemption from

23     the school she was attending?

24          A.   Well, I believe that she was

25     attending a private preschool.  It wasn't a

---

1                    JULIA SYKES             81

2      public school.

3          Q.   Do you know if the Chancellor's

4      Regulations apply to public and private

5      schools?

6          A.   No, only public schools.

7          Q.   How about the State reg, 2164, does

8      that apply --

9          A.   It applies to all schools.

10         Q.   So was Mary, if you know, compliant

11     with the State Health Law in --

Page 69

SYKES DEPO

12     A.    At the private school?

13     Q.    Yeah.

14     A.    I have no idea.

15     Q.    Do you know how it is that a child

16  can attend school in New York City in one

17  school with a valid religious exemption and

18  then be deemed not to have sincere religious

19  beliefs; do you know how that could happen?

20     A.    Well, if it was a private school --

21  although they came from a private school with

22  an approval, however they do their approval

23  process, when they come into our schools they

24  would still have to go through the New York

25  City public school process.  Now, if they

♀

1                    JULIA SYKES                82

2  come from another public school, then it

3  carries on to the next public school.

4     Q.    Does it matter to you that Mary had

5  a religious exemption from the private school

6  prior to your review?

7     A.    No, because that is irrelevant, no.

8     Q.    But you did testify though, that

9  the religious exemption was denied or

10  questioned, right?

11     A.    Okay.

12     Q.    Because she had at first asked for

13  a medical exemption and that was denied?

14     A.    From the public schools, yeah.

15     Q.    So if a parent makes an application

16  for a medical exemption and then follows up

SYKES DEPO

17    with the religious exemption, is that an

18    automatic red flag?

19        A.   Yes.

20        Q.   And if a parent has an objection,

21    or if a parent gets a vaccine in August and

22    then asserts her religious exemption in

23    October, is that a red flag?

24        A.   Yes, it is.

25        Q.   Does that occur even in advance --


1                    JULIA SYKES              83

2     before you review their religious beliefs, do

3     you make that kind of determination before or

4     after you look at the religious exemption

5     statement?

6         A.   Well, I look and see -- I look at

7     the record first before I read the letter.  I

8     don't read the letter first and then look for

9     the documentation.  I get all documentation

10    together before I even attempt to read that

11    letter.

12        Q.   Have you ever received any

13    complaints that any of the CFNs were abusive

14    or intolerant to parents during their

15    interviews?

16        A.   I received one.  Yeah, I did.

17    Well, I didn't receive it personally, but it

18    was -- there was a complaint.  We went for a

19    hearing with that -- well, it wasn't a

20    hearing but we went with City Counsel on

21    that, yes.

22        Q.    Was there a stenographer present

23    during that?

24        A.    No.

25        Q.    Were there attorneys present?


1                    JULIA SYKES              84

2         A.    No.

3         Q.    Was the parent present?

4         A.    No.

5         Q.    What was the purpose of the

6     meeting?

7         A.    Well, they wanted to ask what our

8     procedure was, how -- to ask questions about

9     our procedure like we're doing now.

10        Q.    Tell me more about that.  You got a

11    complaint -- when did you get the complaint?

12        A.    That was -- we went to -- last June

13    -- July.  I'm sorry, last July.  The person's

14    not there anymore, but -- the CFN person.

15    The parent said that she was not very nice to

16    her.

17        Q.    Just not nice?

18        A.    Yeah, she didn't -- it wasn't

19    nothing -- yeah.

20        Q.    Did she say anything that the

21    person was intolerant to their religious

22    beliefs or just not a nice person?

23        A.    No, she was just not nice.

24        Q.    How was she not nice; do you know?

25        A.    I have no idea.  I wasn't there.

                    Page 72

Case 1:12-cv-00984-MEKL-BODomument52-413/271e01D6/19/1368Page73f76f11PageID #: 618

1               JULIA SYKES              85
2          Q.   What happened to that CFN person?
3          A.   She left and went on to another
4     job.
5          Q.   Do you have any procedures in place
6     for reviewing the decision making processes
7     of these CFNs at these levels?
8          A.   No.
9          Q.   Do you ever try to match a CFN with
10    a parent based on religion?
11         A.   No, because the CFN is responsible
12    for a cluster of schools and if it's just
13    their schools then we can't switch them to
14    another CFN.
15         Q.   In your affidavit, you indicate
16    that Mrs. Check did not assert that the
17    tenets of Catholicism prohibit immunizations,
18    and it is in my understanding that all New
19    York City Catholic schools require
20    immunization in the normal course.
21         A.   That's true.
22         Q.   What are the tenets of Catholicism
23    that you would have accepted from Mrs. Check?
24         A.   It would have to be something on
25    the Catholic stationary explaining what their

1               JULIA SYKES              86
2     beliefs are.

SYKES DEPO

3     Q.   I'm not asking about beliefs.  I'm

4  asking about tenets.

5     A.   Or what their tenets are.

6     Q.   Do you -- and I mean this

7  respectfully, do you understand the

8  difference between a belief and a tenet?

9     A.   No, I don't.

10     Q.   In New York State, under an

11  interpretation of 2164 is a case called

12  Sharon Levy versus North Port.  Have you ever

13  read that case?

14     A.   No.

15     Q.   In Sharon Levy, the Courts talked

16  about personal religious beliefs.

17     A.   Okay.

18     Q.   Have you gotten any training at all

19  with regard to what is a personal religious

20  belief versus a tenet?

21     A.   No.

22     Q.   And you don't know what that is,

23  right?

24     A.   No.

25     Q.   But it is the law in New York State


1                  JULIA SYKES         87

2  --

3     A.   For me to have training?

4     Q.   No.

5     A.   Oh.

6     Q.   That an individual does not have to

7  be a member of a particular faith that has

SYKES DEPO

8    tenets --
9         A.   Right, I know that.
10        Q.   But you don't know what a tenet is?
11        A.   Right.  They don't have to belong
12   to a particular faith -- religion, right.
13        Q.   If I was a Christian Scientist,
14   which we -- do you know that Christian
15   Scientists --
16        A.   Yeah, they don't believe in
17   immunizations.
18                  MR. CARTER: Again, you have
19              to let her finish the questions so
20              she can hear that.
21                  THE WITNESS: I'm sorry.
22                  MS. FINN: I think it's me,
23              the way I ask them. I'm sorry.
24        Q.   So you know that Christian
25   Scientists have tenets contrary to

1                  JULIA SYKES              88
2    vaccination.  Do Christian Scientists
3    automatically get exemptions?
4         A.   Yes.
5         Q.   So although you don't know what a
6    tenet is, if someone is a member of a church
7    with a tenet contrary to vaccinating, you
8    grant an exemption?
9         A.    Yes, because the Catholics --
10   unless there's different sects of the
11   Catholic religion, they do believe in

SYKES DEPO

12    immunization.  There may be some that don't.

13    Maybe they don't practice all of that

14    religion.

15         Q.    But weren't you -- were you aware

16    that in New York State you can hold tenets --

17    you can have personal religious beliefs in

18    the tenets of Christian Science without

19    actually being a member of that faith and be

20    entitled to the exemption; do you understand

21    that?

22                    MR. CARTER: Can I have that

23              read back?

24                    (Whereupon, a portion of the

25              testimony was read back.)

1                     JULIA SYKES              89

2                     MR. CARTER: I want to note

3               an objection to form on that.  I

4               just don't think I -- if she

5               understands it she can answer it,

6               but I don't think I do.

7          A.    No, I don't.

8          Q.    Did you know in New York State that

9     you can hold the same beliefs as a Christian

10    Scientist in opposition of vaccinations and

11    not necessarily be a Christian Scientist, and

12    entitled to an exemption?

13                    MR. CARTER: I want to note·

14              just a continuing objection. I

15              won't interrupt again but --

16                    MS. FINN: Yes.

SYKES DEPO

17          MR. CARTER: -- you're asking
18          questions in which you're asserting
19          what the state of the law --
20          MS. FINN: Yes. Yes, I am.
21          MR. CARTER: -- is, and I
22          really think that's unfair.
23          MS. FINN: I will -- no, no.
24          I'm going to withdraw it. Don't
25          even answer it because I'm going to

1                    JULIA SYKES                90
2          reframe it -- withdrawn.
3      Q.   Let me just narrow this down and
4  draw back.
5          Do you know what a tenet is in
6  Catholicism?
7      A.   It's their practices or their
8  beliefs within that -- in that religion.
9      Q.   Do you know what a personal
10 religious belief is?
11     A.   Yeah, a person believes -- that
12 they personally believe this is against what
13 they believe.  They don't believe in --
14 because of whatever religious -- it's what
15 they personally believe is that -- they
16 believe in a certain thing and it's not what
17 they're -- it could be different from
18 whatever religion they're in, but this is
19 something they personally -- their religious
20 beliefs are.  Their beliefs -- their beliefs

Page 77

SYKES DEPO
21    are.

22            MS. FINN: Excuse me one

23        second.

24        Q.    Can you explain -- you said here in

25    the affidavit in paragraph nine: In reviewing


1                    JULIA SYKES              91

2    Mrs. Check's submissions, you did not discern

3    a genuine and sincere religious impetus to

4    her objection.  Rather her objection appeared

5    philosophical and moral.

6            Can you explain to me the

7    difference between a philosophical belief and

8    a religious belief?

9        A.    Well, a philosophical means that,

10   you know, it could be referred to -- I read

11   something, an article and I believe that this

12   article is stating I shouldn't do something,

13   that it's against what I do or they read --

14   or someday -- or something they hearsay --

15   it's like a hearsay.  Someone told them --

16   expressed to them something and they believed

17   it.  It's not religious in nature.

18        Q.    What is a belief that is religious

19   in nature versus philosophical?

20        A.    Philosophical -- well, like I said,

21   philosophical is if I was talking -- say for

22   example I was talking to my girlfriend, and

23   she says that all vaccines are bad and you

24   shouldn't do that.  And the other one is --

25   religion is if this is something that I

                    Page 78

SYKES DEPO

JULIA SYKES                    92

1  believe, solely believe within my heart that
2  it's again, what I was, you know, either
3  taught or that I believe. You know, it's
4  their beliefs.
5       Q.   Isn't it true though that Mrs.
6  Check wrote a three-page paper -- three-page
7  -- two-page statement? Did you believe that
8  her statement was in her own words?
9       A.   I can't say at this time because I
10 read it two years ago.
11                MS. FINN: May I show your
12           client?
13                MR. CARTER: Yeah, of course.
14                Counsel, is this the one
15           that's undated? Oh, actually, we
16           have bates numbers.
17           This is an unbated two-page letter.
18           It has the bates stamps, NYC 199
19           and 200.
20      Q.   Why don't you take a minute to look
21 that over?
22                MR. CARTER: While she's
23           looking at that, can we go off the
24           record?

1  believe, solely believe within my heart that
2  it's again, what I was, you know, either
3  taught or that I believe. You know, it's
4  their beliefs.
5       Q.   Isn't it true though that Mrs.
6  Check wrote a three-page paper -- three-page
7  -- two-page statement? Did you believe that
8  her statement was in her own words?
9       A.   I can't say at this time because I
10 read it two years ago.
11                MS. FINN: May I show your
12           client?
13                MR. CARTER: Yeah, of course.
14                Counsel, is this the one
15           that's undated? Oh, actually, we
16           have bates numbers.
17           This is an unbated two-page letter.
18           It has the bates stamps, NYC 199
19           and 200.
20      Q.   Why don't you take a minute to look
21 that over?
22                MR. CARTER: While she's
23           looking at that, can we go off the
24           record?

JULIA SYKES                    93

MS. FINN: Sure.

Page 79

SYKES DEPO
3     (Whereupon, an off the

4     record discussion was held at this

5     time.)

6       MS. FINN: What was the last

7     question?

8       MR. CARTER: She was just

9     reading the document.

10       (Whereupon, a portion of the

11     testimony was read back.)

12    Q. Do you believe that to be Mrs.

13 Check's own words?

14    A. Some of it is and some of it isn't.

15 I've seen parts of this document in form

16 letters.

17    Q. Can you show me or read to me

18 what --

19    A. The part that -- here it said, on

20 balance of recommended vaccines, most are

21 cultivated from DNA and and RNA from animals

22 like monkeys and chickens.  Also the

23 statement -- oh.  As it is, it is my

24 conscious to oppose vaccines that are

25 deprived from aborted fetal cell lines.

♀

1      JULIA SYKES   94

2 That's -- there's some parts in here that

3 come from the internet -- come from form

4 letters.

5    Q. Do you have sample form letters

6 that you use to --

7    A. I don't have sample form letters,

8      but I review them so much that I know when

9      I'm reading the same letter.

10         Q.    Can I have the letter back?

11             So you think some of it is her own

12     words, but some of it is from the internet?

13         A.    From a letter she may have found,

14     yes.

15         Q.    But you don't know that for sure?

16         A.    No, I don't know that for sure.

17         Q.    So this statement: On balance of

18     the recommended vaccine, most are cultivated

19     DNA and RNA from animals like monkeys and

20     chickens.  Do you believe that sentence to be

21     from a form letter?

22         A.    It's from an internet source, yes.

23         Q.    Do you know the internet source?

24         A.    They -- against vaccines or it's --

25     parents against vaccines.  There's -- you

1                    JULIA SYKES            95

2      know when you google something like that it

3      comes up.

4          Q.    So if anyone submits a request for

5      a religious exemption, a written statement to

6      your office that has this statement in it,

7      what effect does that have on your decision?

8          A.    I send them the letter that says

9      requesting additional information because

10     that's not -- they don't have proof to back

11     up that statement.

SYKES DEPO

12      Q.    So is that, in your opinion, a

13   truthful statement, or is it incorrect that

14   most --

15      A.    I believe it's incorrect.

16      Q.    So you believe it. Do you know

17   whether or not vaccines contain the DNA and

18   RNA of monkeys and chickens?

19      A.    I don't think they do.

20      Q.    But you don't know?

21      A.    No, I don't know for sure.

22      Q.    What if you were told by Dr. Zucker

23   that they do?  Would that change your opinion

24   of Dina Check's letter?

25      A.    Yes.


1                    JULIA SYKES          96

2       Q.    So if you were to be given

3   information from, say Dr. Zucker or some

4   other doctor that vaccines contain the DNA

5   and the RNA from monkeys and chickens, that

6   would change your view of this letter?

7       A.    Yes.

8       Q.    Have you ever read what's on the

9   insert of a vaccine?  Have you ever read

10   what's in the ingredients in vaccines?

11      A.    No, I haven't.

12      Q.    You've never looked at the

13   ingredients?

14      A.    No.

15      Q.    Is that why it doesn't matter to

16   you whether or not people object to all

SYKES DEPO

17 vaccines or particular vaccines; is that why?

18   A. NO. They just have to -- right,

19 because they just have to state that they

20 don't -- they're opposed to all vaccines or a

21 particular vaccine.

22   Q. So you've never read a vaccine

23 insert?

24   A. I've never bothered to look and see

25 what the insert said, no.

1       JULIA SYKES    97

2   Q. And you don't know if it has this

3 -- withdrawn. You've already answered that

4     How about aborted fetal cells; do

5 you know if any vaccines contain aborted

6 fetal cells?

7   A. I had questioned that one time. I

8 sent it to the Bureau of Immunization because

9 a parent had put -- they said they do use

10 some cells from fetuses, like maybe the

11 afterbirth from parents or whatever. It was

12 -- I've asked that question, yes.

13   Q. Does a person who objects to, say

14 abortion as a basis for avoiding vaccines, is

15 that --

16   A. But they have to indicate which

17 vaccines and they have to -- you know, they

18 just can't say -- so if they say of aborted

19 vaccines and they don't say what particular

20 vaccines it is, because it's not all vaccines

SYKES DEPO

21    that -- they have to explain more.  It

22    doesn't automatically -- they don't

23    automatically get a denial.

24        Q.    I get that.  I understand.  But you

25    don't know what vaccines have aborted cells

JULIA SYKES                    98

2    in them either, do you?

3        A.    I've asked.

4        Q.    Do you know?

5        A.    I think it was Varicella.

6        Q.    How about Rubella and Hepatitis; do

7    you know if they contain aborted fetal cells?

8        A.    No, I don't.

9        Q.    What if I told you they did?  Would

10    that change your opinion on this letter?

11        A.    I would go to another -- before I

12    would make a decision on that letter, I would

13    ask the question if this is true or not, yes.

14        Q.    Ask the question from the --

15        A.    Bureau of Immunization.

16        Q.    How about the internet; would you

17    go on the internet?

18        A.    No, I would not go on the internet.

19        Q.    How about the CDC website; have you

20    ever gone on the CDC website for information

21    regarding ingredients in vaccines?

22        A.    No.

23        Q.    So if a parent had a vaccine in

24    August and then objected to a vaccine in

25    October, a particular vaccine that contained

Page 84

1                    JULIA SYKES              99
2    aborted fetal cells was the only reason --
3         A.   Well, that wasn't the reason that
4    that was denied.
5         Q.   I know that. But if that was their
6    only reason, how would you be able to
7    determine whether or not that's sincere or
8    not?
9         A.   Well, if their religious beliefs is
10   against abortion and it's that vaccine that
11   has that aborted fetal cells in it, then I
12   would contact Bureau of Immunization to see
13   if this is a viable exemption request.
14        Q.   In Mrs. Check's letter, when you
15   reviewed it, did she fail to explain and
16   interpret her religious principles contrary
17   to vaccines?
18        A.   Well, with the Check case it was a
19   little different.  I also knew that she had
20   requested a medical exemption and then two
21   days later she requested a religious
22   exemption.  So all of that was taken into
23   account before I sent her a letter to deny
24   it, and sent her for the appeal interview for
25   her to give additional information at that


1                    JULIA SYKES             100
2    appeal interview.

SYKES DEPO

3    Q.   But you did testify that you
4  weren't aware that the child had been in
5  school for two years with a religious
6  exemption in a private school.
7    A.   Right, but that was a private
8  school. I was not aware of that, no.
9    Q.   But you did not know that?
10   A.   No, I didn't.
11   Q.   And it wasn't in the CIR and it
12  wasn't in the AT --
13   A.   Private schools do not have ATS.
14   Q.   Okay. So you get the Check
15  exemption and you don't have any data in the
16  CIR, right? You don't have any data in ATS
17  because this is a new kid?
18   A.   I don't recall because even though
19  it's a new kid, it wouldn't be in ATS.
20  However, it would be in the CIR and I don't
21  recall that this child had anything in either
22  one. I would of had to have looked that up.
23  I don't recall that.
24   Q.   Did you read her letter?
25   A.   I read the letter.

1            JULIA SYKES        101
2    Q.   And then it was an automatic red
3  flag because of the proceeding medical
4  exemption?
5    A.   Right, and she had an opportunity
6  at that time to appeal the medical exemption.
7    Q.   Do you understand -- tell me what

Page 86

SYKES DEPO

8      you know about that medical request that the
9      Checks' made.  What do you know about that
10     process?
11            A.   What the process is?
12            Q.   No.  What do you know about the
13     process related to Mary Check's medical
14     exemption request?
15            A.   I know that it was reviewed by our
16     supervising medical doctor who denied it and
17     then once it was denied, it was sent to me
18     and I sent a letter to the parent.
19            Q.   Do you know if Mrs. Check made that
20     application for the medical exemption or was
21     it somebody else?
22            A.   I assume that she made it, the
23     exemption. It was signed by a parent.
24            Q.   Were you aware that --
25            A.   There was a signature there.  I


1                     JULIA SYKES              102
2      don't know if it was the parent or not.
3      There was a signature there.
4            Q.   Were you aware that there was a mix
5      up with that paperwork with the medical
6      exemption?  Were you aware -- did you have
7      any information?
8            A.   No.
9            Q.   Did you know that the school nurse
10     had actually made the request for a medical
11     exemption by mistake?

Page 87

SYKES DEPO

12      A.    And whose' doctor filled it out?

13  No, I was not aware.

14      Q.    So even though there's some facts

15  here to suggest this application was not made

16  by Mrs. Check and it was made by mistake,

17  automatic red flag because of the medical

18  exemption, right?

19      A.    I was not aware that someone else

20  made the request for an exemption.

21      Q.    There was an application -- there

22  was information provided to the public school

23  regarding Mary's health conditions for 501

24  plan -- is it 501 or --

25      A.    504.


1                  JULIA SYKES          103

2       Q.    504, sorry. And that information --

3   never mind -- withdrawn.

4            So is there anywhere in this letter

5   that you can point out to me where Mrs. Check

6   describes her religious principles, if you

7   don't mind, to your satisfaction that are

8   contrary to vaccinating; is there anything in

9   that entire letter?

10      A.    That describes -- repeat that.  I'm

11  sorry.

12      Q.    Is there anything in that letter

13  you can point to that adequately describes

14  Mrs. Check's religious principles contrary to

15  vaccinating?

16      A.    No.  She states in here: In this

Page 88

SYKES DEPO

17    letter, I am requesting this religious
18    exemption because it's our strong belief that
19    all vaccines are made in violation of God's
20    word.  I was baptized in the Catholic church
21    and through my spiritual journey and
22    religious beliefs, I am definitely against
23    vaccines based on the foundation of
24    Catholicism.  That's the only -- right there.
25    Her beliefs are right there, but based on --

1                  JULIA SYKES            104
2         Q.    Let me see.  Where is that?
3               Is that what you would refer to as
4    an explanation of the religious principles?
5         A.    Uh-huh.
6         Q.    And that was not acceptable to you?
7         A.    And then once I read down further
8    -- I don't have -- I don't know the whole
9    document, everything else that was with this
10   letter.  Because like I stated earlier, I do
11   look at the whole -- the whole picture.  I
12   don't look at just the letter.  I look at if
13   there's any proof of immunizations on file.
14   I don't recall if there were.  And I know
15   that the parent did request a medical
16   exemption which was denied and she had an
17   opportunity, ten school days from the date of
18   that letter to submit -- to appeal the
19   medical exemption, which she did not.  She
20   chose to go the religious route.

Page 89

SYKES DEPO
21          MS. FINN: Excuse me.

22          Q.   With respect to the paragraph: I am

23     requesting this religious exemption because

24     it is our strong belief that all vaccines are

25     made in violation of God's word.  I was



1                    JULIA SYKES              105

2      baptized in the Catholic church and through

3      my spiritual journey and religious beliefs, I

4      am definitely against vaccinations based on a

5      foundation against Catholicism.

6               Is it your opinion that that is an

7      adequate explanation of religious principles

8      contrary to vaccinating?

9          A.   That's part of it, yes.

10         Q.   Just this statement, is that what

11     you would consider?

12         A.   Right.

13         Q.   So Mrs. Check provided you that

14     statement that was acceptable and you still

15     declined her exemption?

16         A.   And then I read on -- read the

17     whole letter.  I didn't just stop there.

18         Q.   What about the rest of the letter;

19     did she contradict --

20         A.   Like I said before, I looked at the

21     whole picture.  I didn't look at just her

22     letter, that statement.  I read the whole

23     letter in its entirety.

24         Q.   Okay.  I'm sorry.  I'm referring

25     just to the four corners of this document.  I

1              JULIA SYKES              106
2     know you looked at other stuff.
3          A.    That would have answered one of the
4     questions, but what is her religious
5     principles opposing the exemptions -- I mean
6     the vaccines.
7          Q.    What is it in this letter that is
8     contravening to that statement, because now
9     you're telling me that statement was good
10    enough, right?
11         A.    I didn't say it was good enough.
12         Q.    I'm sorry. I didn't meant to --
13         A.    Yes, that answers one of the
14    questions: Explain in your only words why
15    you're requesting the exemption.  However,
16    she still has to answer the other three
17    questions and then when I looked at all of
18    the documentation that was submitted for this
19    child, there was -- it wasn't enough.
20         Q.    I understand that.  I'm just right
21    now talking about this statement that is
22    required.
23         A.    Right.  That's one of the questions
24    -- that answers one of the questions, yes.
25         Q.    So because Mary had, or you thought

1              JULIA SYKES              107
2     Mary had made a medical exemption, she goes

Page 91

SYKES DEPO

3    into the rejection mode or the red flag

4    simply because of the medical exemption; is

5    that correct?

6         A.    Yes.

7         Q.    In this red flag area, you send out

8    the supplemental questions, the three of

9    them?

10        A.    Right.

11        Q.    That is in your own words

12   describing religious principles, and it is an

13   objection to all vaccinations or a particular

14   vaccine?

15        A.    Uh-huh.

16        Q.    You've already told me that the

17   third question, all vaccines and particulars

18   doesn't really matter.

19        A.    They have to give you the religious

20   principles behind those vaccines.

21        Q.    Okay. But regarding question number

22   three -- I just want to be clear. You said

23   it doesn't really matter. You said it had no

24   impact. So we're only dealing with two

25   issues here then, whether it's in your own

1              JULIA SYKES              108

2    words, which it was, right? Do you doubt this

3    is in Mrs. Check's words?

4         A.    I don't doubt she didn't write it.

5         Q.    And then you've identified in

6    paragraph two on the first page a religious

7    principle explaining why she -- a religious

Page 92

SYKES DEPO

8    principle that is contrary to vaccinating,

9    right? Isn't that what you just told me?

10        A.   Right.   This (pointing) would

11   answer the first question, yes.

12        Q.   What other questions matter?

13        A.   Well, they all matter.   She has to

14   answer all three questions and then when you

15   go down in this letter, some information

16   that's in here, there's nothing to support

17   what she has in this letter.

18        Q.   Where in the rest of the letter

19   does she contravene that statement here in

20   paragraph two that you've identified as a

21   valid -- I'm sorry -- withdrawn.

22            You did not say valid.

23        A.   I didn't say that.

24        Q.   I'm so sorry. That you identified

25   as a religious principle. Forgive me. You did

1              JULIA SYKES            109

2    not say valid.   I'm sorry.

3              But tell me where -- but we did

4    agree that this paragraph is a religious

5    principle contrary to vaccinating and it's

6    explained, that's question two.   So where in

7    this document is that statement contravened?

8    Where does she contradict that, if you know?

9        A.   Well, in here she puts this

10   statement and then she didn't expound on it,

11   like this would have been -- would have

Page 93

SYKES DEPO

12    answered one of the questions in here, but as

13    I read the whole letter she went on somewhere

14    else.

15        Q.    Let me ask you a question.  If

16    someone gives you a religious exemption

17    statement seeking an immunization waiver,

18    right, and they talk about medicine, does

19    that send up a red flag to you?

20        A.    They talk about medicine?

21        Q.    Yeah, medical reasons for avoiding

22    vaccines.

23        A.    Well, then I would refer -- I would

24    send them a letter telling them that they

25    should request a medical exemption.

1                    JULIA SYKES              110

2        Q.    Well, what if they have both?  What

3    if a person has both religious and medical

4    reasons for avoiding vaccines?

5        A.    We usually don't grant both.  It's

6    not usually granted both medical and

7    religious.  It's either or, medical or

8    religious.

9        Q.    It's either or? Can a person have

10    both?

11        A.    Can they have both?

12        Q.    Yeah.

13        A.    No, we never granted both.

14        Q.    You have never granted anyone both

15    a medical or religious exemption?

16        A.    For one person, no.

Page 94

SYKES DEPO

17    Q.    Is it possible that a person has a

18    medical and a religious reason for avoiding

19    vaccines?

20    A.    Either it's their religious beliefs

21    or it's a medical reason why they can't get

22    the vaccine.

23    Q.    It can't be both?

24    A.    I don't see why -- no.  I may be

25    wrong, but no.


1                     JULIA SYKES              111

2     Q.    Isn't religion and medicine often

3     intertwined?

4     A.    No.

5     Q.    Did you ever go to a hospital and

6     see the chapel?

7     A.    I've seen chapels in there, yes,

8     because they have the chapel there for those

9     people that want to go in to pray.

10    Q.    Do you know why Christian

11    Scientists have tenets contrary to

12    vaccinating; do you know why?

13    A.    No, I don't.  Why?

14    Q.    Because they believe God is -- that

15    people are cured through prayer.  That's

16    their beliefs.  But you would grant an

17    exemption to a Christian Scientist, right?

18    A.    They don't believe in

19    immunizations, yes.

20    Q.    Because they believe prayer cures.

21    Did you know that?

22         A.    Yeah, I know they pray. Yes, they

23    do.  We all do.

24         Q.    But did you know that the tenet is

25    that prayer -- is what cures and individual?


1                    JULIA SYKES          112

2         A.    Right, but to grant an exemption,

3    they do not have to belong to a religious

4    organization.  So I don't even take that -- I

5    don't even look at that that they -- or even

6    if they write a letter stating that I belong

7    to a Christian Science church, they still

8    have to explain what their beliefs are.  I

9    don't just outright just say okay, granted.

10    They put in detail what their beliefs are.

11         Q.    Well, actually you testified

12    earlier that you automatically grant

13    exemptions for Christian Scientists.

14         A.    Well, I should clear that up.

15         Q.    That's okay.

16         A.    When a Christian Science letter

17    comes in saying they belong to a Christian

18    Science religion, the letter just can't say I

19    belong to a Christian Science church.

20    Because although you may belong to a -- or

21    any religion, it doesn't mean that you

22    believe everything that's being taught in

23    that religion.  So they have to explain --

24    just like everybody else, they have to

25    explain what their religious beliefs are.

Case 1:12-cv-00984-MEK-BMK Document 51-13 Filed 06/19/14 Page 97 of 116 PageID #: 642

1          JULIA SYKES          113

2    They just can't say I belong to a Christian

3    Science church because then everybody would

4    say that.

5          Q.    Do a lot of people say that?

6          A.    No, I don't get that many.

7          Q.    You don't get many. Out of the few

8    that -- or out of the number that you have

9    received, you indicated that even if they say

10   they're Christian Scientists they still have

11   to explain?

12         A.    They have to explain what their

13   beliefs are, yes.

14         Q.    Has anybody ever explained the

15   tenets of Christian Science in their written

16   statement to you?

17         A.    Well, they don't put in tenets --

18   they don't use the word tenets, but they put

19   in what their beliefs are.

20         Q.    Then how did you not know what the

21   tenet of Christian Science is? Whether they

22   use that word or not, you told me you didn't

23   know what it was. I told you it was prayer.

24         A.    What I'm saying is, even though if

25   the letter comes in and says they belong to a

1          JULIA SYKES          114

2    Christian Science church, I will send them a

Page 97

SYKES DEPO

3  letter asking them for additional

4  information.

5       Q.   That's not what you said.  You said

6  you automatically approve them.  But let's

7  assume you get one that throws up a red flag,

8  one of the red flags you identified --

9       A.   I would send home a letter asking

10  for additional information.

11       Q.   Even for a Christian Scientist?

12       A.   Yes.

13       Q.   Okay.  So in the additional

14  information, has anybody ever explained to

15  you why Christian Science refuses vaccines?

16       A.   They have not stated that it is

17  because of Christian Science. They put in

18  there it's their religious beliefs. They do

19  not put in that it was just Christian

20  Science.

21       Q.   Do you know any other religions

22  that have tenets contrary to the practice of

23  vaccinating?

24       A.   Israelites.

25       Q.   How about Rastafarian?


1                    JULIA SYKES            115

2       A.   I've seen a few of those.

3       Q.   Do those religions --

4       A.   I send them also an additional

5  information letter.  They just can't put on

6  paper that they belong to this religion.

7       Q.   Well, what if they write they're

Page 98

Case 1:12-cv-00984-KEL-B Document 51-13 Filed 06/19/18 Page 99 of 116 PageID #: 644

8    Rastafarian and explain their beliefs, do

9    they still get a supplemental letter with

10   three questions?

11        A.   If they explain what their beliefs

12   are -- before I look at the letter to pull

13   and see what the history of this child is, if

14   they have no vaccines and I look at their

15   letter and they explain what their beliefs

16   are, yes, it is granted.

17        Q.   So if a person has never had any

18   vaccines for their children, do you send them

19   supplemental -- a request for supplemental

20   information?

21        A.   Ninety-eight percent of the time,

22   yes.  If they have not explained in their

23   first letter what their beliefs are, yes.  If

24   they have, then no.

25        Q.   Let me restate that.


1                    JULIA SYKES          116

2             If a parent submits an exemption

3    request to you and their children have never

4    been vaccinated, you still send them the

5    supplemental information?

6         A.   If the letter does not explain what

7    their beliefs are, yes.  If not, no.

8         Q.   Got it.  Okay.

9                    MS. FINN: Excuse me one

10                   second.  Just give me one minute,

11                   please.

Page 99

12    Q.    I just have a few more questions

13  and they're specific to Mary Check.  Okay?

14    A.    Okay.

15    Q.    Can you tell me, presumably in

16  Mary's case she got a supplemental request

17  for information and you denied that, right?

18    A.    Right.

19    Q.    Is that a yes?  I'm sorry.

20    A.    I believe I did.  I'm not sure.

21    Q.    Do you want to look at your

22  documents, because this is everything related

23  to your affidavit and I just want to make

24  sure you're clear because I want to question

25  you a little bit about that CFN and then

1                    JULIA SYKES            117

2  we'll finish up.

3                    MR. CARTER: Can I just

4                    clarify something?  I think in her

5                    affidavit she's also referring to

6                    documents that were attached to

7                    your complaints. If I'm not

8                    mistaken, I think her affidavit

9                    only included additional documents

10                   so she would have to see both to

11                   get the full record.

12                   MS. FINN: Okay.

13    Q.    So in Mrs. Check's case, you sent

14  her a request for supplemental information?

15    A.    Right.

16    Q.    And that contained the three

SYKES DEPO

17    questions, right?

18         A.    Right.

19         Q.    And then you denied that?

20         A.    Yes.

21         Q.    And why did you deny that?

22         A.    Because it wasn't enough

23    information, so I needed her to go in for a

24    one-on-one interview with the CFN so we can

25    get a better understanding of the request.


1                 JULIA SYKES          118

2          Q.    Did you deny it because she had

3    made a medical exemption first?

4          A.    Well, at that time when they -- I

5    looked at the whole picture before I denied

6    it, yes, and then I sent her to appeal -- for

7    the appeal interview.  Well, I didn't send

8    her, but I told her she can request an appeal

9    interview.

10         Q.    And tell me about that process.

11    What happens in the appeal interview?

12         A.    Well, at the appeal interview, they

13    sit down with the CFN health liaison and

14    answer a series of questions.  At one time it

15    was six questions, now we cut it down to five

16    questions that are asked of the parent,

17    giving the parent an opportunity to submit

18    additional -- give them additional supporting

19    documentation.

20                     MS. FINN: Did you provide me

```
21              with those five questions,
22              Counselor; do you know?
23                      MR. CARTER: Yeah, sure.
24                      MS. FINN: You did. Okay.
25        Q.    What are the five questions, if you
```

```
1                       JULIA SYKES              119
2     know?
3         A.    I don't know them off the top of my
4     head.
5                       MS. FINN: Could you look and
6                 see if you could find the five
7                 questions?
8         Q.    So when a parent is sent to a CFN
9     for an interview --
10        A.    Uh-huh.
11        Q.    -- there are five questions asked.
12    Do you review the answers to those questions?
13        A.    Yes.
14        Q.    Have you ever had a recommendation
15    from a CFN that a parent holds sincere
16    religious beliefs, but you nonetheless
17    declined that request?
18        A.    Yes.
19        Q.    Does that happen a lot?
20        A.    No.
21        Q.    How often has that happened?
22        A.    It happened once.
23        Q.    So in one particular instance you
24    had a CFN at the network level interview a
25    parent, recommended a religious exemption be
```

Case 1:12-cv-00984-WEK-LB Document 51-41 03/F12016 06/19/2068 Page 103 of 116 PageID #: 648

1          JULIA SYKES                120

2     granted, but yet you denied that?

3          A.     Right.

4          Q.     And why did you deny it?

5          A.     Because once I read the information

6     that was -- the answers to the questions, it

7     was not enough information and the CFN,

8     although we take in account their

9     recommendations, the final decision is made

10    at our office.

11         Q.     So what is the purpose of the CFNs

12    interview?

13         A.     So that they can get a better

14    understanding of what the parents objection

15    is to immunization, a one-on-one meeting with

16    the parent and for the parent to -- at that

17    time to give any other documents to support

18    the objections.

19         Q.     Does the CFN determine

20    creditability of the parent?

21         A.     No.    They just write -- they answer

22    the questions and then they write up what

23    transpired -- they're supposed to write up

24    what transpired at the meeting and then they

25    send all documentation, and then when all the

1          JULIA SYKES                121

2     documents come in then the whole package is

SYKES DEPO

3    reviewed again.

4         Q.    Who is assessing sincerity of the

5    religious beliefs; who assesses that?

6         A.    Well, the assessment comes from my

7    office through me and I read everything over

8    again.

9         Q.    Does the -- is the interview held

10   to assess the sincerity of the parents and

11   their religious beliefs?

12        A.    No, it gives the parents an

13   opportunity to have a one-on-one meeting with

14   that person so they can get a better

15   understanding, not to assess them because

16   they don't know if it's a real exemption

17   request or not.   Just to ask the questions

18   and see the sincerity of it, yes.

19        Q.    Well, how could an interviewer, a

20   CFN interviewer not know if something is

21   sincere or not?   Isn't that the purpose of

22   the CFN interview?

23        A.    The purpose of the CFN interview is

24   to give them the additional questions to ask

25   the parent because those questions are not


1                    JULIA SYKES          122

2    given to the parent ahead of time.   Although,

3    I know the questions are out there and the

4    office has given them to the parent.

5         Q.    So who in this complex network is

6    assessing the credibility of the parent? How

7    do you know they're telling the truth?

Page 104

SYKES DEPO

8      A.   Well, they're not looking at the

9   parent to see if they're telling the truth.

10   They want the parent to come in and to answer

11   those five questions and to explain what

12   they're beliefs are, and then they write it

13   up and send it in.  They don't sit there to

14   judge the parent.

15      Q.   What if they're lying; who's

16   judging them?

17      A.   Well, we don't know if they're

18   lying or not.

19      Q.   So then how do you know if they're

20   sincere?

21      A.   Well, we don't know that when their

22   writing the letters either.

23      Q.   Isn't an exemption under state law

24   allowable based on a sincere religious

25   belief?

♀

1            JULIA SYKES        123

2      A.   Yes, that's what the sate law says.

3      Q.   But you don't know if -- you have

4   no methodology for determining sincerity?

5      A.   No.  We don't know if they're

6   sincere or not.  We just -- it's based on

7   what they wrote and we're -- we can't judge

8   what they wrote.

9      Q.   So how many exemptions did your

10   office issue last year, if you recall?

11      A.   I don't have the number, but I can

SYKES DEPO

12    get you that number.

13        Q.   Just approximately, do you

14    remember?  I'm just curious.

15        A.   I don't remember because I didn't

16    count them.

17        Q.   Was it more than a hundred?

18        A.   Oh, it's more than a hundred, yes.

19        Q.   So out of those exemptions, you

20    have no idea?

21        A.   I don't have the number.

22        Q.   Forget the number.  Out of the

23    exemptions that you granted last year, you

24    have no idea whether they were based on

25    sincere religious beliefs or not?


                    JULIA SYKES          124

1

2         A.   Well, if the parents explained what

3     their religious beliefs are, I'm sure they

4     were sincere in what they believe.  It may

5     not be what someone else may believe, but if

6     they wrote it, they're sincere in what they

7     believe.

8         Q.   How do you know they're not lying?

9         A.   I don't know.

10        Q.   Then how do you know they're

11    sincere?

12        A.   I don't know if they're sincere and

13    I don't know if they're not lying.

14        Q.   So out of the hundred plus

15    exemptions that your office granted last

16    year, you don't know if they were sincere or

17    not?

18         A.   No, but they answered the

19    questions.

20         Q.   So if you answer the questions to

21    your satisfaction, you get an exemption?

22         A.   If they answer the questions as put

23    before them, yes.

24         Q.   And you have no method or no way to

25    determine whether or not they're lying or

1                    JULIA SYKES              125

2    telling the truth?

3         A.   No, I don't.

4                    MS. FINN: I have no further

5                    questions, and I thank you kindly.

6                    I appreciate it.

7                    MR. CARTER: Hang on one

8                    second.

9                    Can we go off the record for a

10                   second?

11                   (Whereupon, an off the

12                   record discussion was held at this

13                   time.)

14                   MS. FINN: I would like to

15                   mark this as Plaintiff's 1.

16                   (Whereupon, a subpoena was

17                   marked as Plaintiff's Exhibit 1 for

18                   identification.)

19                   MR. SPIEGELMAN: Ms. Sykes, I

20                   just have a few questions for you.

SYKES DEPO

21               I'm Todd Spiegelman representing

22                the State defendants here.

23   CROSS-EXAMINATION

24   BY MR. SPIEGELMAN:

25       Q.   I wanted to discuss the last point

 

1               JULIA SYKES       126

2   you were talking about with counsel, the

3   genuineness and the sincerity of religious

4   belief.  You mentioned a couple of procedures

5   you used in evaluating a religious exemption.

6       A.   Yes.

7       Q.   Would you say checking to see if

8   someone had applied for a medical exemption

9   just before they applied for a religious

10   exemption is a way of evaluating genuineness

11   or sincerity?

12       A.   No.  I don't check for it because

13   they come to me first -- well, they come to

14   me once it's approved or denied.  They come

15   to me and then --

16       Q.   Right. But when you're --

17       A.   -- that's part of the whole

18   package.

19       Q.   But when you're looking for red

20   flags, are you looking to see whether someone

21   is actually sincere?

22       A.   I'm looking to see how they

23   answered those questions, yes.

24       Q.   I see. And then you check the

25   internet to see if text is taken directly

Case 1:12-cv-00984-WEE-KBbc Document 51-41-03/Filed 06/19/13/1468Page 109 of 116 PageID #: 654

| 1 | JULIA SYKES | 127 |

2  from it.  Are you checking whether that

3  person -- are you checking on the sincerity

4  of the religious belief?

5      A.   No.   When I was given the

6  responsibility of reviewing religious

7  exemptions, I was not given any guidelines as

8  to what I'm looking for.  So what I did was,

9  although internet can be helpful and

10  sometimes it can be not so helpful, I looked

11  on there to see what's out there because I

12  didn't know.  So that's why I went to the

13  internet and I would put in certain things

14  and it would pop up, the letters would pop up

15  and parents used those letters. And then

16  through the course of the years of reviewing

17  exemptions, I would see those same letters.

18      Q.   Right.

19          MR. SPIEGELMAN: Those are

20          all my questions.

21  CROSS-EXAMINATION

22  BY MR. CARTER:

23      Q.    You testified that there's no

24  methodology for determining a person's

25  sincerity.  Would you agree sincerity is a

| 1 | JULIA SYKES | 128 |

2  deeply personal part of a person's makeup?

SYKES DEPO

3      A.    Yes.

4      Q.    You also testified about a variety

5  of procedures you used such as asking them to

6  answer particular questions.

7      A.    Yes.

8      Q.    That helps you reach your ultimate

9  decision?

10      A.    It's one of the decision makings,

11  yes.

12      Q.    When you look at what's directed

13  before you, do you look for consistency in

14  the answers?

15      A.    When I look at the record of

16  immunizations?

17      Q.    No.  When you look at the factual

18  records before you, the answers to the

19  questions, the initial application, anything

20  else that's submitted to you, do you look for

21  consistency of answers in making your

22  determination?  Is that something that helps

23  you decide?

24      A.    I don't compare one exemption to

25  the other.  It's everybody's -- the review of


1                JULIA SYKES            129

2  the record -- the document is individual.

3  It's not -- you know, I don't base it on what

4  I may have read for a prior letter.

5      Q.    You may have misunderstood me.  I

6  meant when you look at the total package of

7  one applicant, say Ms. Check.

Page 110

SYKES DEPO

8      A.   Okay.

9      Q.   Is consistency of their responses

10   something you would look for and consider?

11     A.   Yes.

12     Q.   And if it's inconsistent, does that

13   raise a red flag?

14     A.   Yes.

15     Q.   If you see a statement that's

16   factually incorrect, is that something you

17   would consider in making your final

18   determination?

19     A.   If it's factually incorrect -- if

20   there's something that I'm not sure if it's

21   correct, I will ask another resource if this

22   is correct or not.

23     Q.   I'm going to direct your attention

24   to Exhibit A.  You were shown the letter date

25   stamped 199, in the second paragraph Mrs.


1                 JULIA SYKES              130

2    Check writes:  Quote, I'm requesting this

3    religious exemption because it is our strong

4    belief that all vaccines are made in

5    violation of God's word.  I was baptized in

6    the Catholic church and through my

7    spirituality journey and religious beliefs, I

8    am definitively against vaccinations based on

9    a foundation of Catholicism, end quote.

10     A.   But she didn't go on in this letter

11   to say which vaccines they were.

SYKES DEPO

12    Q.   Right.  Well, my first question is:

13  Is it a foundation of Catholicism to be

14  opposed to vaccinations, generally?

15        I phrased that in a negative way.

16  Let me put it another way.

17    A.   Okay.

18    Q.   I believe you testified earlier

19  that to your understanding Catholics

20  generally are not opposed to vaccination?

21    A.   Correct.

22    Q.   So to your mind, is this statement

23  factually correct?

24    A.   No.

25    Q.   Is that something you consider?

                    JULIA SYKES              131

2     A.   Yes.

3     Q.   It's not a game maker one way or

4   the other, correct?

5     A.   No.

6     Q.   When you review everything that's

7   in the record at the end of the day, aren't

8   you in fact making a determination as to

9   sincerity?

10    A.   Yes, I guess so, yes.

11    Q.   Do you know what the word

12  methodology means technically?

13    A.   No.  What does it mean?

14    Q.   That's not that significant to me.

15        You testified a bit about the three

16  supplemental questions.  If a parent said to

SYKES DEPO

17    you in one of the documents, I'm opposed to
18    the Measles and Varicella vaccination but
19    nothing else, what significance, if any, does
20    that have to you?
21        A.    They still have to explain why.
22        Q.    Is it the inconsistency that
23    troubles you?
24        A.    Right.  They have to say why.
25                MR. CARTER: I have nothing


1                  JULIA SYKES              132
2        further.
3                  (Whereupon, the deposition
4            concluded at 1:20 p.m.)
5
6        _____
7                  JULIA SYKES
8
9
10    Signed and subscribed to before me,
      this_____day of _____ 2014.
11
12    _____
13    Notary Public
14
15
16
17
18
19
20

Page 113

SYKES DEPO

21

22

23

24

25

♀

1                                                                              133

2

3      I N D E X   O F   W I T N E S S E S

4

WITNESS                  EXAMINATION BY        PAGE

5

JULIA SYKES              MS. FINN              5

6

                         MR. SPIEGELMAN        125

7

                         MR. CARTER            127

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:12-cv-00984-WEB-LB Document 51-41 03/20/16/19/16 68 Page 115 of 116 PageID #: 660

1                                                              134

2          I N D E X   O F   E X H I B I T S

3

4     PLAINTIFF'S          DESCRIPTION        PAGE

5          1               Subpoena           125

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                                              135

2

SYKES DEPO

3           C E R T I F I C A T E

4     STATE OF NEW YORK )
                        :
5     COUNTY OF RICHMOND

6

7           I, JENNIFER CASSELLA, a Notary Public

8     within and for  the State of New York, do

9     hereby certify:

10          That JULIA SYKES, the witness whose

11    deposition is hereinbefore set forth, was

12    duly sworn by me and that such deposition is

13    a true record of the testimony given by such

14    witness.

15          I further certify that I am not

16    related to any of the parties to this action

17    by blood or marriage; and that I am in no way

18    interested in the outcome of this matter.

19          IN WITNESS WHEREOF, I have hereunto

20    set my hand this 14th day of May 2014.

21

22
                        JENNIFER CASSELLA
23

24

25

Page 116